705 A.2d 742

BEVERLY OLIVER AND BRUCE OLIVER, PLAINTIFFS–APPELLANTS, v. LOUIS AMBROSE, DEFENDANT–RESPONDENT.

Argued September 22, 1997—Decided February 5, 1998.

384

*Bonnie C. Frost,* argued the cause for appellants (*Einhorn, Harris, Ascher & Barbarito,* attorneys).

*Robert Winters,* argued the cause for respondent Louis Ambrose; *William H. Mergner, Jr.,* argued the cause for Allstate Insurance Co.; and *James M. Williamson,* argued the cause for Cumberland Mutual Insurance Co. (*Mr. Winters, O'Toole & Couch* and *Kennedy & Kennedy,* attorneys for Louis Ambrose; *Leary, Bride, Tinker & Moran,* attorneys for Allstate Insurance Co.; and *Methfessel & Werbel,* attorneys for Cumberland Mutual Insurance Co.; *Mr. Winters, Mr. Mergner, Mr. Williamson, Andrew G. Toulas,* and *William V. Kennedy,* on the joint brief).

The opinion of the Court was delivered by

GARIBALDI, J.

In this appeal, we consider the application of the entire controversy doctrine to the joinder of claims. The primary issue is whether we should create an exception to that doctrine for custody actions. Plaintiffs instituted a tort action against defendant, which is based on the same alleged incidents of abuse by defendant that comprised plaintiff's certification in a prior custody action involving defendant. Specifically, therefore, the question is whether the entire controversy doctrine bars the tort action.

The trial court granted defendant's motion for summary judgment, holding that plaintiffs' tort action was barred by the entire controversy doctrine. The Appellate Division affirmed. This appeal is before us as a result of a dissent in the Appellate Division, *R.* 2:2–1, which claimed custody actions should be exempt from the entire controversy doctrine. We hold that the entire controversy doctrine applies to custody actions.

-I-

## The Relationship

This action arises from a tumultuous eight-year relationship between Beverly Oliver (Beverly) and Louis Ambrose (Ambrose). Their relationship, which began in July 1981 and ended in January 1989, was characterized by cycles of separations and reconciliations. Beverly and Ambrose have varying accounts of what transpired during that period. They first met in January of 1980, when they were both employed in the accounting department of AT & T. When they met, Beverly had recently been divorced, and Ambrose was married and living with his wife and children.

On July 1, 1981, Beverly was involved in an automobile accident, and was hospitalized. The trauma of the accident exacerbated an eating disorder, from which she had suffered since age 13. Thereafter, Ambrose visited Beverly in the hospital, and their friendship evolved into an intimate relationship.

In October 1982, Beverly ended the relationship with Ambrose, and developed a relationship with another man, Timmy. In February or March 1983, Beverly and Ambrose resumed their relationship. In April 1983, Beverly learned that she was pregnant. Beverly contends that when she informed Ambrose of the pregnancy, an argument followed because he wanted her to have an abortion. Beverly claims that during the argument, Ambrose slapped her in the face, pushed her against a wall, and choked her.

A few days later, Ambrose drove Beverly to a clinic where she had an abortion. Beverly contends that Ambrose forced her to have the abortion to make her feel guilty about her relationship with Timmy. She further testified that her eating disorder worsened because she felt guilty about having the abortion.

In December 1983, Beverly became pregnant again. According to Beverly, she had another abortion because Ambrose threatened to kill her if she refused to do so. Thereafter, Beverly again broke off their relationship.

In September 1984, Ambrose's wife filed for divorce, and Ambrose and Beverly reconciled. In December 1984, Beverly became pregnant once again. According to Beverly, when she refused to have an abortion this time, a violent argument ensued during which Ambrose attempted to run her over with his car, chased her into the house while threatening to kill her, tied her to a refrigerator, and threw her down the basement steps and locked the basement door. Later that night, Beverly awoke and discovered that she had miscarried.

Ambrose's version of the same events differs. He claims that an argument occurred after her miscarriage and was unrelated to the pregnancy. He also claims that when he attempted to drive away, Beverly jumped on the hood of his car to prevent him from leaving. Then, when he went to the basement to retrieve his clothes, she followed him, so he ran upstairs and locked the door. After this incident, Ambrose terminated the relationship, but again the two reconciled.

In October 1985, Beverly again informed Ambrose that she was pregnant. Beverly contends that when she informed him of her pregnancy, Ambrose became violent, slammed her against a wall, threw her down a flight of stairs, and kicked her as she lay at the base of the staircase. Later that night she had another miscarriage. Ambrose disputes this account, and claims that he did not see Beverly until after she had had the miscarriage. Thereafter, Beverly told Ambrose that he was not supportive and that she wanted to end the relationship.

In May 1986, Ambrose's divorce became final, and Beverly and Ambrose again reconciled. Subsequently, in January 1988, Beverly informed Ambrose that she was pregnant for the fifth time. According to Beverly, Ambrose demanded that she either have an abortion or put the baby up for adoption. Beverly further alleges that when she insisted on having the baby, Ambrose assaulted her. According to Beverly, these events exacerbated her eating disorder, causing her to be hospitalized on February 16, 1988. During her stay in the hospital, Beverly terminated her relationship with Ambrose. She began dating another co-worker, Bruce Oliver.

Beverly gave birth to Melissa Rose on July 9, 1988, and on July 24, 1988, she became engaged to marry Bruce Oliver. Beverly contends that when she told Ambrose of the engagement, he threatened that she would have to kill him to keep him away from her. Ambrose asserts that during the weeks following Beverly's release from the hospital, he made repeated unsuccessful attempts to visit his daughter, Melissa.

*The Procedural History*

On August 25, 1988, the day after her wedding to Bruce Oliver, Beverly filed a harassment complaint against Ambrose in Raritan Municipal Court. On October 4, 1988, Ambrose filed a Verified Complaint against Beverly in the Chancery Division, Family Part, seeking joint custody of Melissa, visitation, and a support determination. In his Verified Complaint, Ambrose asserted that Beverly

refused to allow visitation. On October 27, 1988, Bruce Oliver filed a Complaint seeking to adopt Melissa.

On October 31, 1988, Beverly filed a responding certification to Ambrose's application for custody and visitation. In the certification, Beverly detailed the abortions and the abusive behavior. In part, Beverly stated:

4. During the course of our relationship I had 2 abortions and 2 miscarriages.... I never felt I had a choice, it was either [Ambrose's] way or no way at all. When I wouldn't consent to an abortion in December 1984, [Ambrose] beat me and threw me down a flight of steps causing me to have a miscarriage. Looking back, I know that I was really afraid of [Ambrose], he was abusing me both mentally and physically. The trauma from my relationship with the plaintiff exacerbated my eating disorder, known as bulimia....

5. During the past seven years, [Ambrose] has tied me to a refrigerator, locked me in the basement, smacked me across the face, and beat my arms until physical bruises showed.... The traumatic emotional scars ... may never heal completely....

6. In January 1988, when I told [him] I was pregnant.... [h]e demanded that I have an abortion.... On January 11, 1988 ... we had a violent argument over my decision to have the baby....

7. The next time I heard from [Ambrose] was February 10, 1988. He came to my home in a rage and demanded that I have an abortion.... From the stress of these constant arguments with [Ambrose], I relapsed into my bulimia again....

9. ... Since my child's birth, [Ambrose] has continually harassed me through friends, family, at work and on the phone. The course of harassment only stopped when I signed a complaint against him in the Raritan Borough Municipal Court for harassment....

11. Indeed, I am afraid for Melissa's safety with [Ambrose]. After 7 years, I state to this Court that [Ambrose] is unpredictable—one moment he seems fine, the next minute he "snaps" and becomes physically abusive. I feel I must protect my daughter from this. Indeed, it is my belief that the real motivation behind this custody action is [Ambrose's] desire to get back at me for ending the relationship. I am afraid that he will try to get back at me through my child....

On November 1, 1988, Beverly filed an Answer to Ambrose's Complaint in the custody action. The Answer did not include any counterclaims or other affirmative claims; however, Beverly asserted that the "Complaint is frivolous and instituted for the sole purpose of continuing a course of conduct of harassment and threats made by [Ambrose] against [Beverly]."

In response to Ambrose's motion, the trial court consolidated the municipal court harassment complaint with the custody action,

and stayed the adoption proceedings pending the outcome of the custody/harassment action. Thereafter, the parties settled the custody and adoption matters, with Ambrose withdrawing his request for custody and consenting to the adoption. The harassment complaint was dismissed.

## Institution of Tort Suit

Four months after that settlement, Bruce and Beverly Oliver instituted a tort suit against Ambrose, based on his alleged abusive and violent behavior against Beverly between 1981 and 1988. The Complaint alleged: assault and battery, intentional and negligent infliction of emotional distress, and loss of consortium for Bruce Oliver.

Ambrose then filed declaratory judgment actions against his homeowner's insurance carriers for coverage of plaintiffs' claims. In August 1990, the court consolidated the declaratory judgment actions with the tort action against Ambrose. In September 1992, the Olivers amended their Complaint to include a claim of false imprisonment. On October 5, 1992, Ambrose filed an Answer to Amended Complaint in which he raised as a separate defense that plaintiffs' claim was barred by the entire controversy doctrine.

In September 1993, Ambrose and his insurers moved for summary judgement on the ground that the tort claims should have been brought in the adoption/harassment action or as counterclaims in the custody action. Ambrose further argued that the tort claims were barred by the applicable statute of limitations. See N.J.S.A. 2A:14-2.

The trial court reserved on the entire controversy doctrine issue, but ordered a plenary "Lopez" hearing, pursuant to N.J.S.A. 2A:14-2, to determine when the statute of limitations began to run. During the eleven-day Lopez hearing, the court heard testimony from Ambrose, Beverly, and from the parties' experts on Beverly's state of mind. Because the trial court found that Beverly failed to show that she was incompetent or otherwise incapable of bringing suit during that period, the court concluded

that the statute of limitations barred all claims that were not instituted within two years from their occurrence. Thus, all claims based on Ambrose's conduct prior to December 26, 1987 were barred.

The court further held that the entire controversy doctrine barred all claims up until August 4, 1989, the date the custody action was settled. The court concluded that "there was an intentional withholding of the claim by [Beverly] knowing that she intended to file it later." Furthermore, "[s]he wanted him to voluntarily surrender any rights to Melissa so that she and Mr. Oliver could raise her as their own, which she succeeded in, and she did not want to upset the apple cart with another lawsuit."

The Olivers appealed. In an unpublished opinion, a divided Appellate Division affirmed the dismissal on entire controversy doctrine grounds. In affirming, the majority reasoned that the entire controversy doctrine "requires that a party who has elected to hold back from an initial lawsuit a related component of the controversy be barred from thereafter raising it in a subsequent proceeding." The court further noted that, in applying the entire controversy doctrine, "the central consideration is whether the claims arise from related facts of the same transaction or series of transactions." The majority, therefore, concluded that since the Olivers' tort claims were based on the same facts relevant to the custody/harassment action, the claims should have been joined in that action.

This appeal is before us as a result of Judge Shebell's dissent, which reads in its entirety:

I would not subscribe to a rule that requires a parent to join a claim for assault in an action to determine custody. It serves no purpose related to the efficient administration of justice and would detract from a determination of the best interests of the child. I would reverse as to the application of the entire controversy doctrine.

The Olivers appealed to this Court under *Rule* 2:2–1. They did not file a petition for certification. Accordingly, the only issue before this Court is the issue raised in Judge Shebell's dissent:

whether the entire controversy doctrine should apply to custody actions.

We affirm the judgment of the Appellate Division, and hold that custody actions are not exempt from the application of the entire controversy doctrine.

-II-

### Background of Entire Controversy Doctrine

For over sixty years, it has been established in New Jersey that the entire controversy doctrine requires the mandatory joinder of all claims to a single transaction. The doctrine; which originated as an equitable common law procedural rule, *see, e.g., Smith v. Red Top Taxicab Corp.,* 111 *N.J.L.* 439, 440–441, 168 *A.* 796 (E. & A.1933) ("No principle of law is more firmly established than that a single or entire cause of action cannot be subdivided into several claims, and separate actions maintained thereon"), is "so deeply rooted in the administration of the judicial system" that it was elevated to constitutional status. *Prevratil v. Mohr,* 145 *N.J.* 180, 187, 678 *A.*2d 243 (1996).

Indeed, Justice Brennan, writing for this Court, recognized that the design and purposes of some of the procedural reforms introduced by the Judicial Article of the 1947 Constitution and the implementing rules of court, were

for the just and expeditious determination in a single action of the ultimate merits of an entire controversy between litigants. It is a fundamental objective of this procedural reform to avoid the delays and wasteful expense of the multiplicity of litigation which results from splitting of a controversy.

[*Ajamian v. Schlanger,* 14 *N.J.* 483, 485, 103 *A.*2d 9, *cert. denied,* 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954).]

In *Cogdell v. Hospital Center at Orange,* 116 *N.J.* 7, 15, 560 *A.*2d 1169 (1989) (citing 2 State of New Jersey Constitutional Convention of 1947, Committee on the Judiciary Report § 11(J) at 1187 (1947)), we observed that "the purposes of the doctrine include the needs of economy and the avoidance of waste, efficiency and the reduction of delay, fairness to parties, and the need for complete

and final disposition through the avoidance of 'piecemeal deci-
sions.' " *See also Falcone v. Middlesex County Medical Soc'y,* 47
*N.J.* 92, 94, 219 *A.*2d 505 (1966) ("The piecemeal litigation of
fragments of a single controversy is too evident an evil to remain
unchecked. . . .")(quoting *Silverstein v. Abco Vending Serv.,* 37
*N.J.Super.* 439, 449, 117 *A.*2d 527 (App.Div.1955)); *Vacca v. Stika,*
21 *N.J.* 471, 476, 122 *A.*2d 619 (1956) (broadening the doctrine by
requiring representative parties to assert counterclaims in one suit
because otherwise a single action would be nothing more than "the
trigger which . . . would start the chain reaction of other litiga-
tion."); Pressler, *Current N.J. Court Rules,* comment 2 on *R.*
4:30A(2)(1998) (citing additional joinder of claims entire controver-
sy cases).

In the interest of fairness and judicial efficiency, "to sanction
[one party's] holding in reserve his one available remedy for the
purpose of attack in another suit, would be utterly destructive" to
the goals of the entire controversy doctrine. *Prevratil, supra,* 145
*N.J.* at 188–89, 678 *A.*2d 243 (quoting *Ajamian, supra,* 14 *N.J.* at
489, 103 *A.*2d 9). Likewise, the Appellate Division has determined
that the entire controversy doctrine requires "a party who has
elected to hold back from the first proceeding a related component
of the controversy be barred from thereafter raising it in a
subsequent proceeding." *Wm. Blanchard Co. v. Beach Concrete
Co.,* 150 *N.J.Super.* 277, 292–93, 375 *A.*2d 675 (1977); *see also
Mortgagelinq Corp. v. Commonwealth Land Title,* 142 *N.J.* 336,
338, 662 *A.*2d 536 (1995) (stating in context of party joinder that if
a party deliberately chooses to fragment litigation court need not
entertain claim against those parties omitted from prior litigation).

Consistent with these goals, *Rule* 4:30A provides a mechanism
to prevent fragmentation of litigation. That Rule states that the
"[n]on-joinder of claims or parties required to be joined by the
entire controversy doctrine shall result in the preclusion of the
omitted claims to the extent required by the entire controversy
doctrine, except as otherwise provided by . . . *R.* 4:67–4(a) (leave
required for counterclaims or cross-claims in summary action)."

■ The entire controversy doctrine encompasses "virtually all causes, claims, and defenses relating to a controversy." *Cogdell, supra,* 116 *N.J.* at 16, 560 *A.*2d 1169. "At a minimum, all parties to a suit should assert all affirmative claims and defenses arising out of the underlying controversy." *Prevratil, supra,* 145 *N.J.* at 187, 678 *A.*2d 243 (quoting *Cogdell, supra,* 116 *N.J.* at 15, 560 *A.*2d 1169). Under *Cogdell, supra,* 116 *N.J.* at 15, 560 *A.*2d 1169, the doctrine also includes counterclaims and cross-claims. *See Ajamian, supra,* 14 *N.J.* at 487–89, 103 *A.*2d 9; *see also R.* 4:7–5; *R.* 4:27–1(b). In applying the doctrine, "[i]t is the core set of facts that provides the link between distinct claims against the same parties ... and triggers the requirement that they be determined in one proceeding." *DiTrolio v. Antiles,* 142 *N.J.* 253, 267–68, 662 *A.*2d 494 (1995).

### The Entire Controversy Doctrine in Family Actions

■ The entire controversy doctrine applies to family actions. *See Brennan v. Orban,* 145 *N.J.* 282, 290–91, 678 *A.*2d 667 (1996) (requiring joinder of a personal injury claim in a divorce proceeding); *Tevis v. Tevis,* 79 *N.J.* 422, 434, 400 *A.*2d 1189 (1979) (stating in dicta that the marital tort claim should have been joined with the dissolution proceeding); *see also Brown v. Brown,* 208 *N.J.Super.* 372, 379, 506 *A.*2d 29 (App.Div.1986) (stating that "[h]ad the marital tort here occurred prior to the institution of the divorce action ... there would be no question of plaintiff's obligation to have raised it as a separate claim in her subsequently filed divorce action"); Pressler, *Current N.J. Court Rules,* comment 5 on *R.* 5:1–2(5)(1998) ("It is, of course, also clear that the entire controversy doctrine applies to family actions. Consequently, a marital tort is required to be joined with a pending family action involving the same parties.").

In *Brennan, supra,* the wife filed for divorce in the Chancery Division, Family Part, in October 1994. Two weeks later, she filed a tort complaint in the Law Division alleging that her husband struck her in the head following an argument in February 1994.

Thereafter, the Family Part consolidated the two actions. In finding that joinder was appropriate under the entire controversy doctrine, the Court reasoned that "[t]he tort arose out of the marital relationship. In addition, the tort complaint alleges many of the same factual circumstances as the divorce complaint that [the wife] had filed two weeks earlier." 145 *N.J.* at 291, 678 *A.*2d 667. In reaching this conclusion, the Court relied in part on *Tevis, supra.*

In *Tevis,* the Court held that the statute of limitations barred a wife's tort claim against her husband because she filed suit two years after the alleged incident. 79 *N.J.* at 432, 400 *A.*2d 1189. Notably, she instituted the tort action against her husband two weeks after the conclusion of the dissolution proceedings. In *dicta,* the Court stated:

> Since the circumstances of the marital tort and its potential for money damages were relevant in the matrimonial proceedings, the claim should not have been held in abeyance; it should, under the "single controversy" doctrine, have been presented in conjunction with that action as part of the overall dispute between the parties in order to lay at rest all their legal differences in one proceeding and avoid the prolongation and fractionalization of litigation.
>
> [*Id.* at 434, 400 *A.*2d 1189.]

Hence, the Court ruled that, under the entire controversy doctrine, marital tort claims should be joined with dissolution proceedings because the potential for money damages was relevant. *Ibid.; see Brennan, supra,* 145 *N.J.* at 290, 678 *A.*2d 667 (discussing *Tevis* ).

### *Equitable Exceptions To Entire Controversy Doctrine*

■ The application of the entire controversy doctrine requires us to consider fairness to the parties, as the "polestar of the application of the rule is judicial fairness." *DiTrolio, supra,* 142 *N.J.* at 272, 662 *A.*2d 494. Consequently, "the boundaries of the entire controversy doctrine are not limitless. It remains an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases." *Brennan, supra,* 145 *N.J.* at 291, 678 *A.*2d 667 (citing *Mystic Isle, supra,* 142 *N.J.* at 323, 662 *A.*2d 523). Thus, equitable considerations can

relax mandatory-joinder requirements when joinder would be unfair. *Prevratil, supra,* 145 *N.J.* at 190, 678 *A.*2d 243.

For example, in *Prevratil,* although the Court found that the entire controversy doctrine applied to actions arising out of automobile accident cases, the Court remanded the matter to the Law Division for a determination of whether it was fair to dismiss the claims. *Id.* at 196, 678 *A.*2d 243. In that case, a possible equitable consideration was the fact that the plaintiff was represented by counsel selected by the insurer in the first action. *Ibid.*

In considering the fairness to the plaintiff, we are mindful that the plaintiff, whose claim is being barred, must have had a fair and reasonable opportunity to have fully litigated her claim in the prior action. *See Cafferata v. Peyser,* 251 *N.J.Super.* 256, 261, 597 *A.*2d 1101 (App.Div.1991). Therefore, we have stated that the doctrine will not bar a claim that was unknown or unaccrued at the time of the original action. *DiTrolio, supra,* 142 *N.J.* at 273–74, 662 *A.*2d 494 (citing comment 2 on *R.* 4:30A). However, where the plaintiff had sufficient information to have included the claims in the prior suit, mandatory joinder is not unfair. *Id.* at 274, 662 *A.*2d 494 (citing *Cogdell, supra,* 116 *N.J.* at 25, 560 *A.*2d 1169).

In *Brown, supra,* while a divorce action was pending, the husband assaulted the wife, pushing her to the ground and twisting her arm. 208 *N.J.Super.* at 378, 506 *A.*2d 29. The Appellate Division considered equitable principles in holding that the entire controversy doctrine did not bar a marital tort action. *Id.* at 374, 506 *A.*2d 29. In support of that finding, the panel observed that the wife's matrimonial lawyer refused to raise the tort action in the divorce proceeding; that the husband was aware of the tort claim during the pendency of the equitable distribution proceedings and filed for bankruptcy in an attempt to avoid it; and therefore, the husband "had already substantially assumed the burdens of successive litigation and had encouraged plaintiff herself to continue in the costly prosecution thereof." *Id.* at 383–84, 506 *A.*2d 29. Hence, the court reasoned that, "[a]lthough we conclude that the entire controversy doctrine ordinarily requires

joinder or attempted joinder of constituent causes arising *penden-te lite*, we are also satisfied that in exceptional cases there may be countervailing equitable considerations which would render application of that doctrine unfair." *Id.* at 374, 506 *A.*2d 29.

In sum, the entire controversy doctrine applies to family actions. Claims stemming from the same core of facts should be raised in one action. Similar to other contexts, the goal is to avoid fractionalized and successive litigation in family actions. The courts have indicated that equitable considerations can relax the application of the doctrine, but the extent to which the doctrine is relaxed depends on the facts of the case and the policy interests implicated.

-III-

*Application of Entire Controversy Doctrine to This Case*

■ The tort suit instituted by plaintiffs involves the same core set of facts that undergirded the custody, adoption, and harassment actions. *See DiTrolio, supra,* 142 *N.J.* at 267–68, 662 *A.*2d 494. In the custody action, Beverly detailed the numerous incidents of alleged abuse and stated:

> I am afraid for Melissa's safety with [Ambrose]. After 7 years, I state to this Court that [Ambrose] is unpredictable—one moment he seems fine, the next minute he "snaps" and becomes physically abusive. I feel I must protect my daughter from this. Indeed, it is my belief that the real motivation behind this custody action is [Ambrose's] desire to get back at me for ending the relationship. I am afraid that he will try to get back at me through my child....

Beverly asserted that Ambrose had abused her mentally and physically, and it was her obligation to protect the child from Ambrose. She argued that Ambrose should be denied custody and visitation because he had been violent and abusive throughout their relationship. These same allegations of abuse formed the basis for this tort claim. Plaintiffs' tort complaint sought monetary damages for the harm suffered as a result of Ambrose's alleged abuse.

Plaintiff argues that in custody actions, the court focuses on the best interest of the child, *Fantony v. Fantony,* 21 *N.J.* 525, 536, 122 *A.*2d 593 (1956), whereas in a tort suit, the focus is on the defendant's actions. Further, in the custody action, "the paramount consideration is the safety, happiness, physical, mental and moral welfare of the child." *Ibid, see also, Terry v. Terry,* 270 *N.J.Super.* 105, 119, 636 *A.*2d 579 (App.Div.1994).

Nevertheless, the focus in custody actions is also on the parents to the extent that it pertains to their fitness as parents and the safety of the child. *See N.J.S.A.* 9:2–4. In making a custody determination, among the factors the court must consider are:

the parents' ability to agree, communicate and cooperate in matters relating to the child; ... *the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent;* ... the stability of the home environment offered; ... the fitness of the parents; ...

[*N.J.S.A.* 9:2–4(emphasis added) ] .

This list of factors makes it obvious that the alleged incidents of abuse were relevant to the custody action because, in custody actions, the court is required to consider the history of domestic violence and the safety of either parent from abuse by the other parent. *See Terry, supra,* 270 *N.J.Super.* at 119, 636 *A.*2d 579 (holding in custody proceeding the court "must reference the pertinent statutory criteria with some specificity"). Additionally, as the Appellate Division correctly pointed out, Beverly's inclusion of the details of the abuse in her certification indicates that she understood their relevance to the custody action.

Likewise, in Ambrose's custody complaint, he requested that a reasonable level of child support be set. *N.J.S.A.* 2A:34–23(a) provides several factors for the court to consider in determining the amount to be paid by a parent for child support. Among the factors listed are "all sources of income and assets of each parent," "[r]easonable debts and liabilities of each ... parent," and "[a]ny other factors the court may deem relevant." *Ibid.; see also Cleveland v. Cleveland,* 249 *N.J.Super.* 96, 101, 592 *A.*2d 20 (App.Div.1991) (holding that it was proper to consider a personal injury award as income in determining level of child support).

Obviously, a judgment in the tort claim would have been a relevant circumstance affecting Beverly's and Ambrose's financial status. Additionally, when the harassment complaint was consolidated with the custody action, the alleged torts became even more germane to the proceedings. Therefore, the two claims should have been joined in the first proceeding.

That plaintiffs' tort action is precluded by application of the entire controversy doctrine is supported further by the trial court's finding that Beverly's decision not to file a tort complaint against defendant while the custody suit was pending was a matter of trial tactics. Beverly's certification in the custody matter belies her claim that she was not fully aware of the extent of the abuse until after the settlement, a mere four months before the filing of this action. Beverly chose to delay filing the tort suit until after defendant voluntarily relinquished his rights to Melissa, so as not to upset the "apple cart." This we cannot sanction. To do so would "be utterly destructive" to the goals of the entire controversy doctrine. *Ajamian, supra,* 14 *N.J.* at 488–89, 103 *A.*2d 9.

### Fairness to the Parties

In applying the entire controversy doctrine to bar plaintiffs' claims, we must also consider the fairness to the Olivers. We begin by noting that any unfairness to plaintiffs is tempered by the fact that most of the Olivers' claims are barred by the applicable statute of limitations. As the trial court decided, even if the entire controversy doctrine would not bar plaintiffs' claims, all claims based on abuse that took place prior to December 23, 1987, were barred by the two year statute of limitations. Thus, the only claims in dispute relate to the seven months prior to the wedding between Bruce and Beverly Oliver, after most of the alleged incidents of violence and abuse took place.

Plaintiffs assert that the time constraints in custody actions make joinder unfair. They contend that because the custody action was filed by Ambrose, and in custody actions "the court

shall set a hearing date no later than three months after the last responsive pleading," *R.* 5:8–6, she had no control over the timing. Plaintiffs further argue that, just as tort claims need not be joined with claims brought under the Domestic Violence Act because of the time constraints, *see Lickfield v. Lickfield,* 260 *N.J.Super.* 21, 614 *A.*2d 1365 (Ch.Div.1992), joinder is also inappropriate in this case because of the time constraints.

In *Lickfield, supra,* the Chancery Division was presented with the task of applying the entire controversy doctrine to the Prevention of Domestic Violence Act ("Domestic Violence Act"), *N.J.S.A.* 2C:25–17 to –33. After the wife had instituted a divorce action, she filed a complaint under the Domestic Violence Act seeking a restraining order. *Id.* at 22, 614 *A.*2d 1365. At the final hearing on the domestic violence complaint, the court made a finding of domestic violence. *Ibid.* The wife's attorney told the court that "[a]ll collateral issues can be done in the 'FM' [i.e. divorce action]." *Ibid.* Thereafter, the wife amended the divorce complaint to include a claim for damages arising from the domestic violence. *Ibid.* The husband moved to dismiss the tort claim on entire controversy grounds. *Ibid.*

The Chancery Division held that the entire controversy doctrine did not bar the claim. In so holding, the court reasoned that "the time restrictions imposed upon the plaintiff by the [Domestic Violence] Act are incongruent with a strict interpretation of the entire controversy doctrine." *Id.* at 24, 614 *A.*2d 1365. The court reasoned that the "expedited process is available for the protection of the victim and to prevent further acts of domestic violence. The process, however, is ineffective if the victim is forced to make a case for damages at that time as well." *Lickfield, supra,* 260 *N.J.Super.* at 24, 614 *A.*2d 1365.

The time limit in custody actions differs from the time constraints imposed under the Domestic Violence Act. Under the Domestic Violence Act, the court has only ten days from the filing

of the complaint to hold a hearing, *N.J.S.A.* 2C:25–29(a), whereas in custody cases, a hearing date must be set "no later than three months after the last responsive pleading." *R.* 5:8–6. Moreover, this was not a simple custody action, as the custody, harassment, and adoption matters were all consolidated into one action.

Although the requirement of joinder may be unfair in some custody actions, nevertheless, we continue to emphasize that "the joinder determination does not repose with the parties;" rather, "[i]t is the trial court's responsibility to determine whether or not joinder is appropriate in a given case...." *DiTrolio, supra,* 142 *N.J.* at 275, 662 *A.*2d 494. The Appellate Division has also noted that "the [trial] court, rather than a litigant acting unilaterally, must make the determination of whether a supplementary claim is to be joined or reserved." *Brown, supra,* 208 *N.J.Super.* at 381, 506 *A.*2d 29. Furthermore, "plaintiff's failure to allow the trial court the opportunity to manage the full controversy at the outset diminishes the force of [plaintiff's] claim that joinder would have been inappropriate." *DiTrolio, supra,* 142 *N.J.* at 275, 662 *A.*2d 494 (citations omitted).

The entire controversy doctrine does not require that tort actions be actually litigated together with custody actions; rather, it mandates that the parties must assert all claims they have against the other parties in one proceeding. *See Brown, supra,* 208 *N.J.Super.* at 381, 506 *A.*2d 29. In a custody action, if the trial court determines that the tort claim is not relevant to the best interest of the child, and finds that the child's interest demands that the claims be severed or reserved, the claims may be severed or reserved for later action. *See* Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 4:30A (1998) ("It is clear that the court has the right to direct reservation of a claim against an existing ... party for later action"). That discretion, however, lies with the court, not with the parties.

Because the only issue before us arises from the dissenting opinion in the Appellate Division, we need not engage in the debate contained in the dissenting opinion concerning the proper

method of pleading a defense of failure to join claims. We would be more sensitive to the matters of inequity claimed in Justice Stein's dissenting opinion if the bulk of Beverly's claims were not already barred by the trial court's ruling on the statute of limitations. (Beverly had unsuccessfully claimed that the discovery rule set forth in *Lopez v. Swyer,* 62 *N.J.* 267, 300 *A.*2d 563 (1973), entitled her to bring the claims more than two years after the occurrence of the injuries.).

In applying the entire controversy doctrine to this case, fairness to defendant must also be considered. No doubt defendant was disadvantaged by plaintiffs' failure to assert the tort claims until after the original action was settled. Defendant settled the custody/adoption/harassment action thinking that he and Beverly had "conclusively dispose[d] of their respective bundles of rights and liabilities that derive[d] from" their relationship. *O'Shea v. Amoco Oil Co.,* 886 *F.*2d 584, 590–91 (3d Cir.1989). It would be unfair to defendant for him to have to litigate those issues that he reasonably believed had already been resolved.

-IV-

In applying the entire controversy doctrine, we must also consider whether mandatory joinder will promote the goal of "judicial economy and efficiency—the avoidance of waste and delay." *DiTrolio, supra,* 142 *N.J.* at 277, 662 *A.*2d 494 (quoting *Cogdell,* 116 *N.J.* at 23, 560 *A.*2d 1169). We have defined inefficiency as "a duplication of lawsuits ... [and] multiple actions each involving the identical controversy and the same witnesses." *DiTrolio, supra,* 142 *N.J.* at 277, 662 *A.*2d 494 (quoting *Cogdell, supra,* 116 *N.J.* at 26, 560 *A.*2d 1169). The court in the custody action and the court in the tort action would both have had to consider the allegations of abuse comprising both the custody certification and the tort complaint. Consequently, judicial efficiency would have been served by settling those issues in the first litigation. Also, although we have acknowledged that the "weight of the economy factor lessens" when the first action is settled, *id.*

at 278, 662 *A*.2d 494, that does not apply in cases such as this, where a party intentionally holds back filing the second claim so as not to upset settlement negotiations.

▮ In this case, the tort complaint was filed on December 26, 1989. However, on October 5, 1992 in his answer to plaintiffs' amended complaint, Ambrose raised the entire controversy doctrine as an affirmative defense. Defendant did not move for summary judgment until September 1993, nearly four years after the filing of the complaint. The entire controversy doctrine's policy against inefficiency and waste of judicial resources, although not entirely negated by this delay, is surely not promoted by such actions. Nevertheless, because judicial economy is only one consideration, and such concerns cannot override the doctrine's overall objective of fairness to litigants, *see DiTrolio, supra*, 142 *N.J.* at 278, 662 *A*.2d 494, the conclusion remains the same: the claim is barred because it was not brought in the original action.

The judgment of the Appellate Division is affirmed.

STEIN, J., dissenting.

The Court's fixation on the entire controversy doctrine continues. It bars the assault claims asserted by the victim of severe domestic violence that allegedly caused two miscarriages, on the ground that those claims were not joined in a prior custody action instituted by defendant, the perpetrator of the alleged assaults. The Court demonstrates its affinity for the entire controversy doctrine by dismissing plaintiffs' complaint notwithstanding that the entire controversy defense was not pleaded as an affirmative defense until defendant answered the amended complaint approximately thirty-three months after the suit was commenced, and was not asserted as a defense in support of defendant's summary judgment motion until nearly four years after the complaint was filed. In the process, the Court utterly ignores its own precedents on waiver of affirmative defenses, *see Williams v. Bell Tel. Lab., Inc.*, 132 *N.J.* 109, 118–20, 623 *A*.2d 234 (1993), and *Fees v. Trow*, 105 *N.J.* 330, 335, 521 *A*.2d 824 (1987), as well as former Presiding

Judge Michels's opinion in *Kopin v. Orange Products, Inc.*, 297 *N.J.Super.* 353, 375, 688 *A.*2d 130 (App.Div.), *certif. denied,* 149 *N.J.* 409, 694 *A.*2d 194 (1997), expressly holding that the entire controversy defense is waived if not asserted within *three* years of the filing of a complaint.

The Court creatively mischaracterizes the waiver issue as a "debate ... concerning the proper method of pleading a defense of failure to join claims," *ante* at 401–02, 705 *A.*2d at 751, and attempts to obscure its inability to meet it by declining to address waiver, inflexibly dismissing it as an issue beyond the scope of the dissent below. A more forthright and accurate response by the Court would unequivocally confirm that the availability of the entire controversy doctrine defense is conditioned on its timely assertion. The Court excuses its silence on the waiver issue and plaintiffs' other equitable arguments by representing that "it would be more sensitive to the matters of inequity" recited in this dissenting opinion if the bulk of plaintiffs' claims had not been barred by the statute of limitations. *Ante* at 401, 705 *A.*2d at 751. The Court fails to acknowledge, however, that claims for compensatory and punitive damages based on intentional assaults remain in the case. Our entire controversy jurisprudence breaks new ground with the Court's assertion that an apparent substantive weakness in a plaintiff's case is a factor that may affect decisively whether the equitable aspects of the entire controversy doctrine will receive recognition.

I

In *Olds v. Donnelly*, 150 *N.J.* 424, 696 *A.*2d 633 (1997), one of last term's most significant cases decided less than six months ago, the Court virtually assured the bar that there would be no more instances of draconian applications of the entire controversy doctrine. In words designed to calm and reassure both litigants and lawyers, the Court benignly observed: "We have always emphasized that preclusion is a remedy of last resort." *Id.* at 446, 696 *A.*2d 633. The Court then cited *Gelber v. Zito Partnership*, 147 *N.J.* 561, 565, 688 *A.*2d 1044 (1997), for the proposition that

"[c]ourts must carefully analyze" both fairness to the parties and fairness to the system of judicial administration "before dismissing *claims or parties* to a suit." *Olds, supra,* 150 *N.J.* at 446–47, 696 *A.*2d 633 (emphasis added). Continuing, the Court cited both *claim joinder* and party joinder cases in support of the principle that "[t]he purpose of the doctrine is not to bar meritorious claims, but to encourage litigants to bring to the attention of trial courts persons [or claims that] should be joined in a proceeding." *Id.* at 447, 696 *A.*2d 633.

And just one year before deciding *Olds,* the Court in *Brennan v. Orban,* 145 *N.J.* 282, 678 *A.*2d 667 (1996), confronted with the question whether marital tort claims joined with other domestic relations claims should be tried by a court or by a jury, held that the "court should decide whether, on balance, the interests in vindicating the marital tort outweigh the interests of a unitary disposition of the family dispute and warrant a jury trial." *Id.* at 304, 678 *A.*2d 667. The Court in *Brennan* emphasized that, in balancing those interests, the severity of the violence inflicted merits significant weight:

> Obviously, the court will consider in its assessment of the interests, the nature and extent of the violence inflicted on the spouse, be it mental or physical. After all, "these disputes are not private wars. Acts of domestic violence are often crimes. The public has an interest, wholly apart from that of litigants, in the fair and effective resolution of these cases." Trial by jury, for reasons rooted in our history and tradition, is a special repository of public confidence that our laws will be vindicated.
>
> [*Ibid.* (citations omitted).]

Notwithstanding its recent pronouncements in *Olds* and *Brennan,* the Court bars plaintiffs' tort action against defendant Ambrose because plaintiff Beverly Oliver failed to assert her tort claims as counterclaims in the custody proceeding previously filed by Ambrose. In holding that *preclusion*—the remedy of last resort—is appropriate here, the Court apparently overlooks or attaches little significance either to the numerous equitable factors or to the allegations of extreme violence that militate against so severe a remedy:

● Ambrose's custody action, filed in October 1988, was settled without a trial in August 1989, and apparently imposed only a minimal burden on judicial resources in the Family Part.

● Although the Olivers' tort action was filed in December 1989, the motion for summary judgment based on the entire controversy doctrine was not filed until November 1993, *nearly four years later.* At the time the motion was filed, Ambrose was being defended on plaintiffs' *negligence* claims by counsel for Allstate and Cumberland Insurance Companies, the homeowners' carriers covering Ambrose for the time period at issue, and by personal counsel on plaintiffs' claims of intentional tort and punitive damages. The summary judgment motion, *filed only by counsel for Allstate,* was not granted until December 1994, after Allstate's counsel in October 1994 sought reconsideration by the trial court of the prior motion.

● In the course of her eight-year relationship with Ambrose, Beverly Oliver became pregnant five times. Two pregnancies were terminated by abortion, Oliver alleging that Ambrose forced her by threats and violence to terminate those pregnancies. The next two pregnancies terminated by miscarriages that Oliver alleges were caused by violent beatings inflicted on her by Ambrose. Following the fifth pregnancy, Melissa Rose Oliver was born July 9, 1988. In explaining during depositions why she did not seek to assert her tort claims against Ambrose in the custody suit he filed, Beverly Oliver testified that "my concentration during that period was to make sure that Melissa Rose was safe and cared for and got the best care that she could. I did concentrate on that [and] I wasn't looking at what had gone on with me." She testified that in the custody case she focused on the safety of her daughter, "paramount to everything else."

● Beverly Oliver filed a certification during the custody proceeding that informed both the Family Part judge and defendant of her allegations that she was viciously and violently assaulted by Ambrose. Nevertheless, Ambrose consented to the dismissal with prejudice of his custody action without requiring Oliver to release him from liability for his assaultive conduct.

● Under *Brennan v. Orban, supra,* Oliver's allegations that Ambrose brutally and violently assaulted her on numerous occasions would have required a jury trial (and a jury trial was demanded in the tort action) even if the tort claims had been asserted in the custody case. Those allegations include:

April 1983: Angered that she was pregnant, Ambrose slapped her in the face, pushed her against a wall, and choked her;

December 1983: Upon learning that Oliver was pregnant again, Ambrose threatened to kill her if she did not have an abortion;

December 1984: When Oliver refused to terminate another pregnancy by abortion, Ambrose tried to run her over with his car, tied her to a refrigerator, and threw her down the basement steps, causing a miscarriage;

October 1985: Angered over another pregnancy, Ambrose threw her against a wall, flung her down a flight of stairs, and kicked her. Another miscarriage followed.

Putting to one side the equitable roots of the entire controversy doctrine, one would assume that the Court would understand fully why Oliver, whose *four* prior pregnancies allegedly were terminated either by abortions coerced by Ambrose or miscarriages caused by Ambrose's violent assaults, would not wish to entangle the custody proceeding, in which she was highly likely to prevail, with an extremely adversarial tort litigation against Ambrose. Viewed in the context of our precedents that compel consideration of equitable factors, and taking into account the powerful public policy articulated in *Brennan, supra,* favoring judicial vindication of aggravated domestic violence assaults, the Court's disposition precluding the Olivers' tort action constitutes an astonishing repudiation of our precedents.

## II

Long before our decision last term in *Olds, supra,* our cases have emphasized the equitable underpinnings of the entire controversy doctrine and its focus on fairness. As Justice O'Hern observed in *Brennan, supra:* "Despite its policy of joinder of claims, the boundaries of the entire controversy doctrine are not limitless. It remains an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases." 145 *N.J.* at 291, 678 *A.*2d 667 (citation omitted). In our application of that doctrine, we have "proceed[ed] on a step-by-step basis recognizing that the doctrine is one of judicial fairness and will be invoked in that spirit." *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 343, 476 *A.*2d 250 (1984); *see also Cogdell v. Hospital Ctr.,* 116 *N.J.* 7, 23, 560 *A.*2d 1169 (1989) (stating that "party fairness is critical in the application of the entire controversy doctrine"). Because the doctrine is so inextricably dependent in its application on principles of fairness, we have been cautious not to "convert the entire controversy doctrine from an equitable device into a trap for the unsuspecting." *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 263, 597 *A.*2d 1101 (App.Div. 1991).

Unfortunately, as on a prior occasion, see *Prevratil v. Mohr*, 145 *N.J.* 180, 199, 678 *A.2d* 243 (1996)(Stein, J., dissenting), the Court gets the wrong answer in this case because it poses the wrong question. Respectfully, the issue before us cannot simply be framed as "whether we should create an exception to [the entire controversy] doctrine for custody actions." *Ante* at 386, 705 *A.2d* at 743. The critical issue is more specific, focusing on whether "based on the factual circumstances of [this] individual case[ ]," *Brennan, supra*, 145 *N.J.* at 291, 678 *A.2d* 667, the doctrine should or should not apply as a matter of judicial discretion.

The equitable factors overwhelmingly dictate that the entire controversy doctrine not be applied. As Judge Michels observed in *Kopin v. Orange Products, Inc., supra*, 297 *N.J.Super.* at 375, 688 *A.2d* 130, where the entire controversy defense was not raised for more than *three* years, that defense is waived if it is not asserted in a timely manner:

> Beyond this, even if the entire controversy doctrine were applicable, defendant waived that defense. The entire controversy doctrine is an affirmative defense. *R.* 4:5–4 provides in part that "[a] responsive pleading shall set forth specifically and separately a statement of facts constituting an avoidance or affirmative defense...." "[A]n affirmative defense is waived if not pleaded or otherwise timely raised." In addition, a party's conduct can estop him/her from relying on an affirmative defense.
>
> [Citations omitted.]

*See also Williams, supra*, 132 *N.J.* at 119, 623 *A.2d* 234 (holding statute of limitations defense waived although pleaded but not thereafter asserted until post-trial motion); *Fees, supra*, 105 *N.J.* at 335, 521 *A.2d* 824 (holding statute of limitations defense waived when neither pleaded nor raised in defendant's motion for summary judgment); *Brown v. Brown*, 208 *N.J.Super.* 372, 383–84, 506 *A.2d* 29 (App.Div.1986)(holding in marital tort action that entire controversy defense was waived when not asserted until two and one-half years after filing of complaint); Pressler, *Current N.J. Court Rules*, comment on *R.* 4:6–7 (1997) ("While this rule does not expressly so state, ordinarily affirmative defenses required to be pleaded by *R.* 4:5–4 which are not so pleaded or otherwise timely raised are waived.").

As in *Kopin, supra,* defendant did not plead the entire controversy doctrine as an affirmative defense for almost three years and delayed *nearly four years* before raising the doctrine as a basis for summary judgment. In the interim, plaintiffs had proceeded with discovery and preparation for trial, and "defendant had already substantially assumed the burdens of successive litigation and had encouraged plaintiff herself to continue in the costly prosecution thereof." *Brown, supra,* 208 *N.J.Super.* at 383–84, 506 *A.*2d 29. If the entire controversy doctrine is intended to avoid burdening judicial resources with duplicative litigation, that purpose is hardly advanced when the doctrine is permitted to be applied after the second case is almost four years old.

Moreover, as noted, although the crux of the complaint alleged intentionally tortious conduct, the entire controversy defense was raised by counsel for one of Ambrose's homeowners' carriers who was defending Ambrose only on the peripheral allegations of negligent infliction of emotional distress. Ambrose's personal counsel, who was defending the intentional assault allegations, never raised that defense. The lower courts erred when they did not hold, as in *Kopin, supra,* that the entire controversy defense had been waived, or could not as a matter of fairness be applied so late in the litigation. This Court now perpetuates that error.

Moreover, as a matter of judicial burden, the docket entries in the prior custody action reveal virtually no judicial involvement between the complaint's filing in October 1988, and its voluntary dismissal by Ambrose in August 1989. As the Court observed just last term in *Karpovich v. Barbarula,* 150 *N.J.* 473, 481–82, 696 *A.*2d 659 (1997): "The consent judgment thus involved virtually no judicial resources. Judicial involvement was so minimal as not to warrant the invocation of the entire controversy doctrine."

Another equitable consideration is that our Rules of Court treat custody cases differently from other actions because the primary concern is the best interests of the child. *Rule* 5:8–6 provides:

Where the court finds that the custody of children is a genuine and substantial issue, the court shall set a hearing date no later than 3 months after the last

responsive pleading. The court may, in order to protect the best interests of the children, conduct the custody hearing in a family action prior to a final hearing of the entire family action.

Accordingly, custody actions impose significant time restraints on the parties and, in addition to the virtual certainty that the tort action would have been tried to a jury, Oliver's counsel justifiably may have assumed that as a matter of practicality the tort action could not have been ready for trial in time to be tried simultaneously with Ambrose's custody suit.

### III

Although our Court's emphasis in *Brennan, supra,* on the importance of providing judicial vindication for egregious assaults in domestic violence cases, 145 *N.J.* at 304, 678 *A.*2d 667, occurred in the context of resolving whether such suits should be tried to a jury or by the Family Part as a matter ancillary to the domestic relations litigation, our observations in *Brennan* cannot be viewed as an analytically watertight compartment unrelated to the equitable foundations of the entire controversy doctrine. In the context of the issue raised in this appeal, the entire controversy doctrine's focus on fairness and *Brennan*'s focus on the importance of judicial vindication for egregious acts of domestic violence are complimentary analytical strains. Taking Oliver's allegations as true for purposes of Ambrose's summary judgment motion, her tort complaint presents multiple claims of vicious and contemptible acts of domestic violence. In enacting the Prevention of Domestic Violence Act of 1991, the Legislature forcefully expressed its purpose to afford victims of domestic violence, whether spouses or cohabitants, the maximum protection from abuse the law can provide:

The Legislature finds and declares that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; *that a significant number of women who are assaulted are pregnant;* that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is

therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.

[*N.J.S.A.* 2C:25–18 (emphasis added).]

Moreover, the Legislature specifically directed the judiciary to provide both "emergent and long-term civil and criminal remedies" to address and vindicate the interests of victims of domestic violence. *Ibid.* The Legislature stated:

The Legislature finds that battered adults presently experience substantial difficulty in gaining access to protection from the judicial system, particularly due to that system's inability to generate a prompt response in an emergency situation.... *Further, it is the responsibility of the courts to protect victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions,* and by ordering those remedies and sanctions that are available to assure the safety of the victims and the public. To that end, the Legislature encourages ... the broad application of the remedies available under this act in the civil and criminal courts of this State.

[*Ibid.* (emphasis added).]

Surely, the Legislature would be surprised to learn that its determination to provide comprehensive relief to victims of domestic violence could be frustrated by a procedural bar to recovery invoked four years after the commencement of civil litigation by counsel whose representation of defendant was only tangentially related to the claims of intentional tortious assault that constitute the focus of the suit.

Fairly evaluated, Oliver's entitlement to compensation for Ambrose's violent assaults constitutes a strong and independent equitable factor that should preclude application of the entire controversy doctrine in this litigation. Combined with the other persuasive equitable considerations that support Oliver's contentions—including the delay of four years in Ambrose's assertion of the entire controversy doctrine and the minimal expenditure of judicial resources in the custody proceeding—the application of the entire controversy doctrine to bar the Olivers' tort claims ignores the doctrine's equitable foundations and frustrates the interests of justice.

I can readily acknowledge the significance of the judiciary's interest in avoiding duplicative litigation that underlies our claim-

joinder rule. But Beverly Oliver's interest, after two coerced abortions and two violence-induced miscarriages, in keeping separate her assault claims against Ambrose from his claim for custody of or visitation rights with her infant daughter, is an equitable interest that in the context of her allegations of violent assault deserves compassionate recognition by any court. If the entire controversy doctrine is grounded in equitable principles, the Court's clinical and unsympathetic elevation of the judiciary's generalized interest in claim joinder over the equitable interests of this litigant is dismaying and disappointing.

## IV

I previously expressed the view that

[t]he framers of the Judicial Article of the 1947 Constitution would be appalled to learn that the "fusion of the powers of Law and Chancery in one Superior Court," designed to avoid the delay and duplication that results from "the splitting of a controversy," has been transformed into a bureaucratic procedural snare that closes the courthouse doors to innocent litigants with meritorious claims.

[*Prevratil, supra*, 145 *N.J.* at 211, 678 *A.2d* 243 (Stein, J., dissenting) (citations omitted).]

Those who combined to produce the Judicial Article and our unified court system understood the administrative benefits of claim joinder, but those benefits are lost if the second suit is allowed to drag on for four years before the non-joinder defense is asserted. When we permit that defense to be asserted successfully at a point in the litigation when the joinder requirement no longer serves the purpose of avoiding the second suit, our application of the entire controversy doctrine becomes pointless and mechanistic, achieving none of the judicial management goals that inspired the doctrine, and serving no useful purpose except to bar the potentially meritorious claim of a litigant. In my view, such a bureaucratic application of the entire controversy doctrine is at odds with our basic mission:

But the fundamental harm done here is institutional. The judiciary exists to dispense justice, not deny it. We act in conflict with our most basic duty and function when we adopt rules or announce decisions that close the courthouse doors even to a single deserving litigant. The public that we serve is entitled to take for

granted that when we act to bar meritorious claims we do so cautiously and reluctantly, and proceed only because the administrative goals that we advance are so essential and beneficial to the administration of justice as to warrant the [application] of a preclusionary rule.

[*Id.* at 214, 678 *A.2d* 243.]

I would reverse the judgment of the Appellate Division and remand the case for trial to the Law Division.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—6.

*For reversal and remandment*— Justice STEIN—1.