806 A.2d 810 (2002)
354 N.J. Super. 229
HOBART BROTHERS COMPANY, an Ohio Corporation, Plaintiff-Appellant,
v.
NATIONAL UNION FIRE INSURANCE COMPANY, A Pennsylvania corporation, and Greenwich Insurance Company, f/k/a Harbor Insurance Company, a California corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 2002.
Decided September 9, 2002.
*811 John S. Vishneski, III, Chicago, IL, admitted pro hac vice, argued the cause for appellant (Robertson, Freilich, Bruno & Cohen, Newark; Holland & Knight, Providence, RI and Neal Gerber & Eisenberg, Chicago, IL, attorneys; Gregory J. Schwartz, Karen A. Mignone, Providence, RI and Mr. Vishneski, on the brief).
Karol Corbin Walker, Newark, argued the cause for respondent National Union Fire Insurance Company of Pittsburgh (St. John & Wayne, attorneys; Ms. Walker, of counsel; Vincent S. Ziccolella, on the brief).
Miles E. Twaddell, West Orange, argued the cause for respondent The Continental Insurance Company (Sehr Cortner McNaboe Colliau & Jordan, Los Angeles, CA, attorneys; Mr. Twaddell, on the brief).
Before Judges WEFING, CIANCIA and FUENTES.
The opinion of the court was delivered by
*812 WEFING, J.A.D.
Plaintiff Hobart Brothers Company (Hobart) has appealed from trial court orders granting summary judgment to National Union Fire Insurance Company (National Union) and The Continental Insurance Company (Continental). The trial court entered these orders after it determined that plaintiff was precluded from continuing with this suit under the entire controversy doctrine. In addition to seeking to have its suit reinstated, Hobart also seeks to have the matter heard by a different judge. After reviewing the record in light of the contentions advanced on appeal, we have concluded the motion was prematurely granted and reverse and remand for further proceedings. We see no basis, however, to order the matter to be heard by a different trial judge.
The present action is a declaratory judgment action that Hobart filed in 1997, in which it sought a ruling that it was entitled to coverage under a comprehensive general liability (CGL) insurance policy issued to Hobart by National Union for costs associated with the environmental clean-up of property located in Nutley. Hobart also joined as a defendant Harbor Insurance Company, the issuer of its umbrella liability policy, seeking coverage under that policy as well. Continental is the successor to Harbor.
The matter has a complex background, both in terms of its factual development and litigation history. It is necessary to set this history forth in some detail in order to analyze the parties' respective contentions.

I
The property in question is located in an industrial park in Nutley. For more than thirty years the site was operated as a lumberyard, but in 1963 a building was erected on the property from which a textile-cutting company conducted business. That use ended in 1968, and the building was then leased to a company known as Nova Industries Inc. (Nova), which was in the business of manufacturing uninterruptible power equipment. Such equipment serves to stabilize electrical currents to guard against pulsations, peaks or shutdowns. In the course of its operations, Nova used various degreasing agents, including trichloroethene (TCE) and trichloroethane (TCA). It ceased using TCE in 1984.
In 1984, Hobart acquired Nova. The transaction was structured as a reverse subsidiary merger in which Hobart established a new subsidiary, acquired Nova, and then merged Nova into that newly-formed subsidiary. After the transaction was completed, Hobart continued to operate Nova as a wholly-owned subsidiary. At the time of the Hobart-Nova transaction, New Jersey's Environmental Clean-up Responsibility Act (ECRA), N.J.S.A. 13:1K-6 to-13 was in effect, and the Hobart-Nova transaction triggered certain obligations under that statute, including obtaining the approval of the New Jersey Department of Environmental Protection (DEP) for the proposed transfer. Those obligations, however, were not complied with.
In 1990, Hobart sold the assets of Nova to yet another entity, Technology Dynamics Inc. This transaction also triggered ECRA, and this time Hobart, as the seller, notified DEP. Because the site was contaminated by spills of TCE and TCA that had occurred when Nova was operating its business, Hobart had to have DEP approval of the sale. In order to obtain that approval, Hobart entered into an administrative consent order detailing its plan to clean up the site.
*813 In order to recoup the expenses it would incur as part of this clean-up, Hobart commenced two separate lawsuits. The first, in 1992, was a legal malpractice action against the law firm of Gutkin, Miller, Shapiro and Selesner, which had represented Nova at the time of the 1984 acquisition and merger. The theory of the suit was that compliance with ECRA was the responsibility of the seller, and that the Gutkin firm, as counsel to the seller, was responsible for the failure to attend to the ECRA requirements. Gutkin's malpractice carrier happened to be National Union, Hobart's general liability insurer. National Union provided coverage to the Gutkin firm in this ligation.
Hobart was the only named plaintiff in the suit against the Gutkin firm despite the fact that Hobart did not have an attorney-client relationship with the firm. Hobart, moreover, did not present a malpractice claim against the firm that had represented it in the transaction.
The second law suit was filed in 1993 against Atlantic Mutual Insurance Company (Atlantic Mutual), which had been Nova's primary general liability carrier for more than ten years. Atlantic Mutual had provided coverage both before and after Nova's merger with Hobart. Within its suit, Hobart alleged that Atlantic Mutual was obligated to provide coverage for the costs of the clean-up of the Nutley parcel. In contrast with the malpractice suit, Nova, who was the named insured on the policies, was included as a named plaintiff in the Atlantic Mutual action.
Hobart retained the same firm to handle both lawsuits. Each complaint that was filed included a certification under R. 4:5-1. The certifications, however, merely recited a belief that there were no other parties that should be joined. The answer filed on behalf of the Gutkin firm, on the other hand, referred to Hobart's failure to join the general liability carrier for Hobart as a party to the suit.
Further, counsel defending the Gutkin firm in the malpractice litigation sought, as part of discovery, information about Hobart's own liability insurance coverage. Hobart did not provide the requested information, however, and instead only supplied information regarding Nova's liability insurance policies.
At some point during the Gutkin litigation, a substitution of attorney occurred and new counsel took over defense of the legal malpractice claim. Substituted counsel did not pursue the question of Hobart's liability insurance.
Although Hobart actively pursued the claims against the Gutkin firm and Atlantic Mutual, it did not present a claim to National Union under its own CGL policy. At the same time that Hobart was attempting to recoup its clean-up expenses from Atlantic Mutual and Gutkin, it was also involved in a number of toxic tort cases in which various plaintiffs were seeking damages from Hobart for exposure to welding fumes. Hobart was looking to National Union to provide coverage to it in those cases, and as a result, it made a conscious choice not to pursue National Union in connection with the Nutley matter. Hobart's general counsel testified in his deposition:
The concern always was that we had had"we," Hobart, had a fine working relationship with National Union as well as, for that matter, USF & G and Great American, parties who we litigated against for this toxic tort coverage, had maintained good relationships with them on the defense of cases, these welding cases that were ongoing and very voluminous and potentially very costly. And we candidly didn't wantnecessarily want to pursue National Union unless we really thought it was absolutely necessary *814 because we didn't want to jeopardize the health of that ongoing relationship on the other cases. The other cases were very much larger in potential liability.
There were literally thousands and thousands of these lawsuits, welding fumes lawsuits pending and the aggregate potential liability from them was far, far, far in excess, much in excess of anything that would have flowed from the Nova site.
And that is the basic preservation of the good will of the relationship was really the governing sort of watch word, as it were, of our thoughts on that.
The Atlantic Mutual and Gutkin law suits both settled in 1995. The claim against Atlantic Mutual settled for a total of $973,454, comprised of $269,438 in cash and the balance in an annuity. The claim against Gutkin settled for $100,000.
Hobart provided releases in connection with each of these settlements. Specifically, its agreement with Atlantic Mutual provided in part that the payment by Atlantic Mutual "extinguish[ed]" all of Atlantic Mutual's obligations to contribute to the clean-up or remediation of the site. Further, Hobart agreed to:
fully release[ ] and forever discharge[ ] Atlantic Mutual from any and all obligations to provide defense and/or indemnity for any and all claims for clean-up or remediation of Environmental Pollution at or emanating from the Site and for Environmental Pollution in any way related to the Site. It is expressly agreed and understood by and between the parties hereto that should any future Claims for Environmental Pollution arise out of the alleged involvement of Hobart with the Site that those obligations, in any form, shall not be the responsibility of Atlantic Mutual since this Agreement is full, complete and final.
The settlement agreement executed as part of the Gutkin lawsuit called for a somewhat different release, however. Hobart agreed that upon payment of the settlement amount it would provide a general release to all the defendants and individual shareholders of the Gutkin firm, and would also provide National Union with a release
limited to claims that have been or could have been made in the future in this litigation upon National Union's professional liability insurance policy issued to... Gutkin ... This release shall have no effect on any claim under any insurance policy issued by National Union to Hobart ...
That language was not included in the original draft of the settlement agreement. Its later insertion indicates that it was not considered to be a routine clause included in all such agreements. The settlement agreement, to which National Union was made a signatory as well as the parties, also included National Union's agreement not to seek reimbursement for the settlement amount from anyone other than its own reinsurers.
National Union contends that the practical result of the manner in which these two settlements were structured was to foreclose the possibility of any future claim against Atlantic Mutual, which had been the carrier which had insured against the risk, while assuring that claims against National Union, which had not insured Nova, the party alleged to be responsible for the contamination, had not been extinguished. The attorney who represented Hobart in these two suits could not recall at his deposition why Hobart would have provided some form of release to National Union as part of the settlement of the Gutkin suit when National Union was not a party to that suit, nor why the release *815 specifically excepted Hobart's policies with National Union.
When Hobart learned of its clean-up obligations for the site, it retained the services of an environmental consulting firm to advise it of the extent and cost of the work required. The firm, eventually known as Harding Lawson Associates (HLA), first estimated in 1991 that the work would cost approximately $700,000, but it cautioned that the estimate was based on insufficient data and thus should not be relied upon. HLA then prepared a second estimate several years later, in July 1994, in which it expressed the opinion that it would cost approximately $1.4 million to clean up the site. Hobart settled its claims against Atlantic Mutual and Gutkin in 1995 for slightly in excess of $1 million.
However, in December 1994, HLA's project manager wrote a letter to Hobart's in-house engineer in which he substantially increased the amount of the estimate, to $2.7 million. Though the project manager testified there was no reason he would not have sent the letter advising Hobart of this increase, Hobart maintained it did not receive the letter until after consummation of the settlements with Atlantic Mutual and Gutkin. Hobart's engineer, however, had suffered a heart attack in December 1994 and was out of the office for some period of time recuperating. He testified in his deposition that the revised estimate could have gotten "waylaid" during his illness. When the revised estimate of $2.7 million surfaced in October 1995, Hobart terminated HLA. Hobart had not set aside any reserves for an expenditure of this magnitude in connection with the clean-up of the Nutley site.
In July 1997, more than two years after receiving this increased estimate, and five years after suing the Gutkin firm for malpractice, Hobart began this suit, asserting that National Union and Harbor were obligated to provide coverage for the costs associated with cleaning up the environmental contamination at the Nutley site. It did not assert in this lawsuit any claim against HLA for improperly advising it of the costs associated with the work.

II
Once this lawsuit was filed, it did not proceed smoothly through the court system. The vicinage in which it was filed routinely divided all environmental insurance litigation between two particular judges for case management. Unfortunately, this matter was, for whatever reason, not properly identified as such a suit; rather, it was classified as a book account and placed on a routine track for disposition. Its disposition was further hampered by its being shifted between different judges, none of whom identified it as an environmental insurance coverage suit.
National Union eventually retained present counsel to defend the matter. Counsel was familiar with the practice in the vicinage and knew that such matters were allocated between the two responsible judges based upon docket numbers. Rather than communicating with the presiding judge and requesting that the matter be assigned for case management in accordance with routine practice, counsel, relying upon her familiarity with vicinage practice, wrote to the judge who would ordinarily be responsible for the matter, requesting that judge assume case management responsibilities. Counsel also filed the substitution of attorney with that judge effecting present counsels' representation of National Union, rather than filing a motion seeking leave to do so. Other counsel in the matter, however, were not familiar with vicinage practice in this regard, and misinterpreted the letter as an attempt to "judge shop," a misunderstanding *816 that led Hobart's counsel to complain both to the Assignment Judge and the judge who, at that time, had been handling the case as a routine commercial matter. This had the unfortunate result of straining future communications.
Recognizing those misunderstandings, the Assignment Judge then assigned the matter to himself for case management. Despite his best management efforts, however, he was unable to conclude the matter before his retirement. The matter was then assigned to the judge who, if matters had proceeded in the usual course, would have been responsible for its management at the outset.
Nearly a year after present counsel entered the matter, and two years after this suit was filed, National Union moved for summary judgment, arguing that this suit was barred under the entire controversy doctrine. National Union contended that Hobart had made a conscious choice not to join National Union as a party to the two earlier lawsuits, and that as a result, it was irremediably prejudiced by its omission. National Union stressed that it had been denied the opportunity to investigate whether there were other potentially responsible parties who should have been compelled to participate in the costs of any clean-up, and also had been completely precluded from asserting a claim against Atlantic Mutual, the carrier who had insured against that risk.
Hobart, on the other hand, argued that the entire controversy doctrine was inapplicable. It contended that National Union had suffered no prejudice and, in support of that position, stressed that National Union had to have been aware of the prior litigation because it had provided a defense to the Gutkin firm. Hobart also contended the doctrine should not be applied to it because Hobart was a different entity than Nova.
The matter was extensively briefed and argued, and the judge who ultimately heard the motion concurred in National Union's analysis and granted its motion. Continental subsequently filed its own motion for summary judgment. The judge granted that motion as well. Hobart has appealed to this court from those two orders.

III
The entire controversy doctrine has been a cornerstone of New Jersey's jurisprudence for many years. Falcone v. Middlesex County Med. Soc'y, 47 N.J. 92, 219 A.2d 505 (1966); Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J.Super. 277, 375 A.2d 675 (App.Div.), certif. den. 75 N.J. 528, 384 A.2d 507 (1977). It has gone through several evolutions, from a doctrine of mandatory joinder of claims, to mandatory joinder of parties, Cogdell v. Hospital Center at Orange, 116 N.J. 7, 560 A.2d 1169 (1989) to inclusion of potential legal malpractice claims, Circle Chevrolet Co. v. Giordano, Halleran & Ciesla, 142 N.J. 280, 662 A.2d 509 (1995), to an exemption for legal malpractice claims. Olds v. Donnelly, 150 N.J. 424, 696 A.2d 633 (1997). The history of the doctrine's evolution is set forth in greater detail in the Court's opinion in Oliver v. Ambrose, 152 N.J. 383, 392-94, 705 A.2d 742 (1998), and Olds, supra, 150 N.J. at 431-34, 696 A.2d 633.
The doctrine requires a litigant to present "all aspects of a controversy in one legal proceeding." The Malaker Corp. Stockholders Prot. Comm. v. First Jersey Nat'l Bank, 163 N.J.Super. 463, 496, 395 A.2d 222 (App.Div.1978). It is "intended to be applied to prevent a party from voluntarily electing to hold back a related component of the controversy in the first proceeding by precluding it from *817 being raised in a subsequent proceeding thereafter." Oltremare v. ESR Custom Rugs, Inc., 330 N.J.Super. 310, 315, 749 A.2d 862 (App.Div.2000).
As with many legal principles, it is more easily stated than applied. The entire controversy doctrine is, at bottom, an equitable one. Joel v. Morrocco, 147 N.J. 546, 555, 688 A.2d 1036 (1997); Hillsborough Twp. Bd. of Educ. v. Faridy Thorne Frayta, 321 N.J.Super. 275, 284, 728 A.2d 857 (App.Div.1999); Pressler, Current N.J. Court Rules, Comment 1 on R. 4:30A (2002). It rests upon the "twin pillars [of] fairness to the parties and fairness to the system of judicial administration." Joel, supra, 147 N.J. at 555, 688 A.2d 1036 (citing Prevratil v. Mohr, 145 N.J. 180, 197, 678 A.2d 243 (1996)). The Supreme Court has propounded:
The application of the entire controversy doctrine requires us to consider fairness to the parties, as the "polestar of the application of the rule is judicial fairness." Consequently, "the boundaries of the entire controversy doctrine are not limitless. It remains an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases."
[Oliver v. Ambrose, supra, 152 N.J. at 395, 705 A.2d 742 (citations omitted).]
Because a violation of the entire controversy doctrine may result in the preclusion of a claim, a court must consider whether the party against whom the doctrine is sought to be invoked has had a fair and reasonable opportunity to litigate that claim. Hillsborough Twp. Bd. of Educ. v. Faridy Thorne Frayta, supra, 321 N.J.Super. at 284, 728 A.2d 857. In considering that question, a court must remember that the "entire controversy doctrine is not intended to be a trap for the unwary." Joel, supra, 147 N.J. at 554, 688 A.2d 1036. On the other hand, a court must also be sensitive to the possibility that a party has purposely withheld claims from an earlier suit for strategic reasons or to obtain "two bites at the apple." Hillsborough Twp. Bd. of Educ. v. Faridy Thorne Frayta, supra, 321 N.J.Super. at 284, 728 A.2d 857 (citations omitted). A court should not permit itself to be made a party to such strategic choices that wreak unfair results upon others.
Following the Supreme Court's decision in Olds, supra, that legal malpractice actions were excepted from the scope of the entire controversy doctrine, the Court adopted the recommendation of the Civil Practice Committee and amended R. 4:30A to restrict the scope of the doctrine to non-joinder of claims, as opposed to its earlier formulation of non-joinder of claims and parties. The amended rule has been interpreted as having "pipeline" retroactivity, i.e., it is applicable to those matters pending at the time of the amendment. Higgins v. Swiecicki, 315 N.J.Super. 488, 493, 719 A.2d 166 (App.Div.1998); Mitchell v. Procini, 315 N.J.Super. 557, 566, 719 A.2d 201 (App.Div.1998). The rule in its amended form thus governs this matter.
If the rule had not been amended, the determination of the motion judge could, perhaps, be affirmed on the record as it stands. As the comment to the revised rule makes clear, however, "mandatory party joinder under the entire controversy doctrine has been eliminated, and preclusion of a successive action against a person not a party to the first action has been abrogated except in special situations involving both inexcusable conduct ... and substantial prejudice to the non-party resulting from omission from the first suit." Pressler, Current N.J. Court Rules, Comment 1 on R. 4:30A, (2002). New Jersey having abandoned mandatory party joinder, the party invoking the entire *818 controversy doctrine has the burden of establishing both inexcusable conduct and substantial prejudice.
Here, the motion judge concluded that the fact that Hobart had not joined National Union in the earlier suits was a sufficient basis, by itself, to preclude Hobart from maintaining the present action. The motion judge did not go through an analysis of whether Hobart's action in deliberately not joining National Union should be characterized as inexcusable. Nor did the motion judge rule upon the validity of National Union's claims of prejudice.
We decline to answer those questions in the first instance and thus remand the matter to the motion judge for further proceedings in that regard. Without intending to create an exhaustive list, certain factors should be considered by the motion judge in analyzing the matter:
(1) Is National Union precluded, as it contends, from seeking recovery from Atlantic Mutual?
(2) If National Union is precluded, can it be compensated by an allocation calculation, as Hobart asserts?
(3) Was Hobart's failure to supply information about its liability carriers as part of the Gutkin discovery an attempt to thwart the assertion of a claim against National Union?
(4) Was Hobart's action in settling with Atlantic Mutual and Gutkin without conferring with HLA as to the status of its cost estimates unreasonable in the circumstances
(5) Should National Union, as the Gutkin firm's malpractice carrier, be charged with knowledge of the Nutley claim? In this latter regard, all the participants in this matter have addressed that issue based upon their own alleged understanding of the internal workings of insurance carriers, without any specifics to the instant claim. Determining the parameters of resolving that issue will require some careful analysis. National Union has, for example, already produced for in-camera review its file in connection with the legal malpractice litigation. After an in-camera review, the Assignment Judge wrote to all counsel that no "document contained any information of plaintiff's claim for coverage against National Union [and] [n]o reference to any insurance policy issued by National Union to Hobart was found." We leave to the trial judge and the parties whether that statement sufficiently demonstrates that its malpractice section, which defended claims presented against an insured, operated independently of the section which handled first-party claims by its own insureds.
(6) What impelled Hobart to insert in the Gutkin settlement agreement the apparently unique provision exempting its own liability policies with National Union from the scope of the release it was to provide?
(7) To what extent were judicial resources called upon in connection with the earlier suits?
(8) Was Hobart's decision to settle its claims relating to the clean-up of the Nutley site without calling upon its own insurance policies reasonable?
(9) What is the nature of the prejudice to which National Union might be subjected if this suit were allowed to continue, i.e., is its ability to mount a defense to this claim unfairly hampered, or is the prejudice restricted to the release of Atlantic Mutual, or is it a combination of both? In this regard, we have in the past spoken of the concept of substantial prejudice for purposes of claim preclusion in terms of the loss of evidence, *819 Mitchell v. Procini, 331 N.J.Super. 445, 454, 752 A.2d 349 (App.Div.2000), but we do not understand the concept of substantial prejudice to be necessarily restricted to that area alone. The running of a period of limitations or the bar of a claim for contribution or indemnification may constitute substantial prejudice in certain contexts.
(10) What is the impact, if any, of the Supreme Court's recent opinion in K-Land Corp. No. 28 v. Landis Sewerage Auth., 173 N.J. 59, 800 A.2d 861 (2002), issued after this appeal was argued?
We note, in addition, that the factors of inexcusable conduct and substantial prejudice are, in a sense, inter-related. They are different points along a graded spectrum, but it is the final result they produce which must be weighed in deciding whether fairness requires that a party be precluded from presenting its claim.
Further, the judge's analysis must be guided by the recognition that "preclusion is a remedy of last resort.... `Courts must carefully analyze' both fairness to the parties and fairness to the system of judicial administration `before dismissing claims.'" Vision Mortgage Corp. v. Chiapperini, Inc., 156 N.J. 580, 584, 722 A.2d 527 (1999) (citations omitted). Nothing within our opinion, however, should be understood as restricting the authority of the motion judge to determine upon remand that no remedy short of dismissal is appropriate in the context of this matter after a full consideration of the items we have listed, together with such other factors as the judge and counsel may identify as bearing upon the question.
We conclude this portion of our opinion by noting that we reject Hobart's contention that the entire controversy doctrine is inapplicable to this matter. In determining whether claims should be joined in a single litigation, courts should look at the core set of facts that provides the link between distinct claims against the same or different parties. Oliver v. Ambrose, supra, 152 N.J. at 394, 705 A.2d 742; DiTrolio v. Antiles, 142 N.J. 253, 267-8, 662 A.2d 494 (1995). The essential consideration is whether "distinct claims are aspects of a single larger controversy because they arise from interrelated facts." Id. at 271, 662 A.2d 494. Here, all of Hobart's claims in this suit arise from a single controversy (responsibility for the costs of cleaning up the Nutley site) that was at issue in the earlier suits.
Hobart also argues that the entire controversy doctrine is inapplicable because its claims had not accrued at the time of the earlier suits. It stresses that the clean-up has not yet been completed and asserts its cause of action would not accrue until that is accomplished, DEP approval obtained, and its costs settled. Again, we disagree.
Vision Mortgage Corp. v. Chiapperini, supra, is instructive. In that case, the Court held that the fact that damages could be uncertain does not delay the accrual of a cause of action for purposes of entire controversy analysis. "`It is not necessary that all or even the greater part of the damages have to occur before the cause of action arises.'" Vision, supra, 156 N.J. at 586, 722 A.2d 527, (quoting Grunwald v. Bronkesh, 131 N.J. 483, 495, 621 A.2d 459 (1993)). To adopt Hobart's position could result in the litigation of environmental contamination matters being delayed until years after the contamination was first identified. Such an approach would not foster the prompt disposition of such claims or the prompt remediation of the affected site.
We also reject Hobart's contention that National Union's delay in moving for judgment on the ground of the entire controversy *820 doctrine should bar it from obtaining such relief. National Union has asserted the defense since it initially filed its answer, in October 1997. In Oliver v. Ambrose, supra, the Court affirmed the dismissal of a matter on the ground that it violated the entire controversy doctrine when the defense had not even been asserted until the suit had been in existence for more than two years, and was not raised by way of motion until yet another year had passed. 152 N.J. at 390, 705 A.2d 742.

IV
We turn now to Hobart's appeal from the grant of summary judgment to Continental. The motion for summary judgment filed on behalf of Continental rested on the simple premise that Hobart should have asserted its claims under its umbrella policy at the time of the earlier suits, and that Continental was entitled to judgment under the same principles that were the basis of the dismissal in favor of National Union. The parties orally argued before the motion judge whether, under the policy language in question, Continental could ever be called upon to provide coverage to Hobart. They have repeated those arguments in their briefs to us. It was not necessary to address that question below, and it is not necessary to address it here. The motion judge ruled ultimately that the decision on the entire controversy doctrine made earlier as to National Union was the law of the case as to Continental. We concur that was the only question before the motion judge and consider it the only question properly before us. The same analysis that we have set forth in regard to Hobart's claim against National Union applies with regard to its claim against Continental, and the same result must flow, that is, a remand for further proceedings.

V
Finally, we reject, as we noted at the outset of our opinion, Hobart's request that this matter be assigned to a different judge. We have reviewed this record carefully and have seen nothing that would indicate that this judge is unable to decide this matter in a completely fair and unbiased manner. We are confident the judge will do so.

VI
The matter is reversed and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.