**The CENTER FOR PROFESSIONAL ADVANCEMENT, Plaintiff,**

v.

**Mark G. MAZZIE and Metlife, Inc., Defendants.**

**Civ. No. 03–cv–4263 (HAA).**

United States District Court, D. New Jersey.

Dec. 9, 2004.

Brian J. Bolan, Esq., Gennet, Kallmann, Antin & Robinson, P.C., Parsippany, NJ, for Plaintiff.

Joseph F. Lagrotteria, Esq., Vincent S. Ziccolella, Esq., St. John & Wayne, L.L.C., Newark, NJ, for Defendant MetLife, Inc.

## OPINION AND ORDER

ACKERMAN, Senior District Judge.

This matter comes before the Court on Defendant MetLife, Inc.'s ("MetLife") motion for summary judgment to dismiss Plaintiff The Center for Professional Advancement's ("CPA") complaint for failing to comply with New Jersey's "entire controversy" doctrine and the certification requirements of New Jersey Rule of Court 4:5–1. For the following reasons, MetLife's motion for summary judgment is DENIED.

## I. BACKGROUND

The parties stipulate to the following facts for purposes of the instant motion only. On June 4, 2001, Mark G. Mazzie ("Mazzie") became interim president of CPA as part of the negotiations process by which Mazzie's company was seeking to acquire CPA. At the time, Charles Bendel ("Bendel") owned CPA. When negotiations between Mazzie's company and CPA failed, Mazzie was terminated from his position as interim president of CPA on November 28, 2001. In February 2002, Mazzie sued CPA and Bendel in New Jersey Superior Court, Middlesex County (the "State Court Action"), alleging various causes of action arising out of his brief tenure with CPA.

On March 20, 2002, the state court entered a default judgment in favor of Mazzie. Shortly thereafter, the defendants in the State Court Action filed a motion to vacate the default, which the court apparently granted. The defendants then filed, among other documents, an answer, a verified counterclaim, and a third-party complaint against another of Mazzie's companies. In their counterclaim, the defendants accused Mazzie of committing various acts of malfeasance, including tortious interference with prospective economic advantage, breach of fiduciary duty, misappropriation of confidential information, and unfair competition.

On May 10, 2002, the matter was transferred to the Chancery Division, where CPA's theory of liability focused exclusively on the alleged malfeasance of Mazzie and his agents. Several days earlier, CPA, in connection with an amended application for an order to show cause, filed with the court an affidavit from CPA's then-president, Joseph Coyne (the "Coyne Affidavit"). Therein, Mr. Coyne averred that Mazzie, without authorization, had sold shares of MetLife that were owned by CPA, and had illegally deposited the proceeds of these sales, totaling $98,332.00, into his personal bank account. CPA made similar statements in its amended verified counterclaim, which it filed on the same day that it filed the Coyne Affidavit. Then, in late May and June 2002, in briefs filed with the state court, CPA argued that an injunction was needed to prevent Mazzie from dissipating the funds he obtained from his unauthorized sales of MetLife stock. In July 2002, CPA filed a second amended answer, a verified counterclaim, and an amended third-party complaint against Mazzie's bank, Mellon Financial Corporation ("Mellon"). Once again, CPA's papers accused Mazzie of conversion. The third-party complaint against Mellon alleged that Mellon had deposited several checks from Mazzie while failing to recognize that they were endorsed by only one of the two named payees.

Mellon moved to dismiss the amended third-party complaint on October 16, 2002. In its moving papers, Mellon argued that MetLife, the payor on the checks that Mazzie deposited in his Mellon bank account, had been ambiguous as to whether the checks were alternatively or jointly payable to CPA and Mazzie. Thus, as a matter of New Jersey law, Mellon argued

that the checks must be construed as payable in the alternative. Under such a construction, Mellon would bear no liability to CPA. CPA cross-moved for summary judgment on the theory that the checks were jointly payable.

At oral arguments before Judge Messina on December 20, 2002, the court inquired whether MetLife was an indispensable party. The court observed that if it found that only one signature was required for the endorsement, then Mellon would prevail on its motion for summary judgment, and MetLife might then be partially liable to CPA for having improperly made the checks payable in the alternative. CPA's counsel responded by stating that if Mellon prevailed on its motion, CPA's recourse would be against Mazzie, not MetLife. Specifically, CPA's attorney opined:

> So, the question is, does MetLife belong in this? And under this context, I—I would say no, simply because it's an interpretation issue of the check. If you find they [Mellon] did nothing wrong, do we have a claim against MetLife? I think our claim is rather against Mr. Mazzie because he's the one that asked to—asked to get these checks without our permission and that our claim against him is really one of—of fraud and conversion.... I don't think we really have a claim against MetLife simply because the way that they wrote the check is clear.

(MetLife's Statement of Material Facts ¶ 37.) The court then pressed CPA for a commitment that it would not seek relief against MetLife "no matter what the outcome of this [motion] is today." (*Id.* ¶ 38.) CPA's counsel responded by again stating that "I don't think we have a colorable claim against MetLife.... [I]t was only by Mark Mazzie's conduct that the check was issued, Your Honor. And that's why we think our claim would be against Mark Mazzie." (*Id.* ¶ 41.) The judge then granted Mellon's motion to dismiss and denied CPA's cross-motion for summary judgment, but not before observing that "I certainly gave [CPA's counsel] an invitation to tell me that the joining of MetLife was mandatory, but he declined to accept my invitation in that regard." (*Id.* ¶ 43.)

CPA filed a notice of appeal from the trial court's ruling, but the appeal was dismissed on the ground that it was an appeal from an interlocutory order. CPA never subsequently attempted to appeal the court's ruling. Rather, the pending claims and counterclaims between CPA and Mazzie were tried on May 15 and 16, 2003. On May 29, 2003, the trial judge entered a final judgment in which he dismissed with prejudice all claims and counterclaims except CPA's counterclaim for conversion, which the judge dismissed without prejudice.

On July 22, 2003, CPA filed the instant action against Mazzie and MetLife in New Jersey Superior Court, Law Division, Middlesex County. As before, CPA alleged that Mazzie had wrongfully converted the MetLife shares. In addition, CPA alleged that MetLife had been negligent or reckless in selling its shares and then mailing the proceeds to Mazzie's residential address. The case was removed to this Court in September 2003.

The parties do not dispute that the factual allegations in the instant action are nearly identical to those contained within CPA's verified counterclaim against Mazzie and amended third-party complaint against Mellon in the State Court Action. As such, MetLife argues that the instant action violates New Jersey's entire controversy doctrine. MetLife also contends that throughout the State Court Action, CPA was fully aware of MetLife's role in the alleged conversion, yet failed to amend its Rule 4:5–1 certification to identify Met-

Life as a potential party, as required by the rule.[1] For each of these reasons, Met-Life seeks dismissal of CPA's complaint.

CPA's moving papers provide additional information that casts the facts of this litigation in a different light. According to CPA, the instant action is actually a subrogation action brought on behalf of CPA's insurer, the Atlantic Mutual Insurance Company ("Atlantic"). CPA was insured under a fidelity policy with Atlantic in November and December 2001, at the time of Mazzie's allegedly fraudulent stock sales. However, CPA waited until February 26, 2003 before filing a claim with Atlantic. On May 14, 2003, Atlantic duly paid $98,438.17 to CPA in satisfaction of CPA's claim. The terms of the fidelity policy provided that upon payment, Atlantic became the subrogee of CPA with respect to any claims the latter might have against third parties.

In May 2003, after Atlantic learned of the State Court Action, Atlantic's counsel assumed prosecution of CPA's claim for conversion of the MetLife stock. On May 15, 2003, Atlantic's counsel successfully moved the state court to sever the conversion claim from CPA's other claims. Accordingly, the trial judge dismissed CPA's conversion claim without prejudice, and Atlantic's counsel initiated the instant action on CPA's behalf in July 2003. CPA now argues that neither the entire controversy doctrine nor New Jersey Rule of Court 4:5–1 warrants a grant of summary judgment for MetLife.

## II. ANALYSIS

■ Article IV, section 1 of the United States Constitution, along with the Full Faith and Credit Act, 28 U.S.C. § 1738 (2000), requires a federal court to give the same full faith and credit to the acts, records, and judicial proceedings of a State as they would have in the courts of that State. Thus, "a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give." *Peduto v. City of N. Wildwood,* 878 F.2d 725, 728 (3d Cir.1989). The United States Supreme Court, however, has expressly recognized an exception where application of state preclusion law would violate principles of due process. *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 482, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

■ Under the Full Faith and Credit Act, the Third Circuit has required New Jersey federal courts to apply the "entire controversy" doctrine, as that doctrine is recognized by the New Jersey state courts. *Rycoline Prods., Inc. v. C & W*

1. New Jersey Rule of Court 4:5–1(b)(2) requires each party in a civil action in Superior Court to file, along with their first pleading, a certification stating, inter alia,

the names of any non-party who should be joined in the action pursuant to R. 4:28 or who is subject to joinder pursuant to R. 4:29–1(b) because of potential liability to any party on the basis of the same transactional facts. Each party shall have a continuing obligation during the course of the litigation to file and serve on all other parties and with the court an amended certification if there is a change in the facts stated in the original certification.... If a party fails to comply with its obligations under this rule, the court may impose an appropriate sanction including dismissal of a successive action against a party whose existence was not disclosed or the imposition on the noncomplying party of litigation expenses that could have been avoided by compliance with this rule. A successive action shall not, however, be dismissed for failure of compliance with this rule unless the failure of compliance was inexcusable and the right of the undisclosed party to defend the successive action has been substantially prejudiced by not having been identified in the prior action.

R. 4:5–1(b)(2).

*Unlimited,* 109 F.3d 883, 887 (3d Cir.1997). The entire controversy doctrine is an equitable preclusionary doctrine that requires the parties to a litigation to assert all known claims that arise from the underlying occurrence or transaction. *See Joel v. Morrocco,* 147 N.J. 546, 548, 688 A.2d 1036, 1037 (1997). Originally, New Jersey courts understood that the doctrine was limited to claim preclusion and did not require joinder of nonparties. *See, e.g., Aetna Ins. Co. v. Gilchrist Bros., Inc.,* 85 N.J. 550, 428 A.2d 1254 (1981) (holding that entire controversy doctrine did not bar subrogee of insured from bringing suit against alleged tortfeasor and his employer, where subrogee had not been joined as a party to an earlier suit by insured against the same defendants for the same conduct). The case of *Crispin v. Volkswagenwerk, A.G.,* 96 N.J. 336, 476 A.2d 250 (1984), however, presaged the eventual expansion of the entire controversy doctrine to include joinder of transactionally related nonparties. In *Crispin,* the New Jersey Supreme Court held that the plaintiff's failure to join Volkswagen as a defendant in a first action precluded him from later suing Volkswagen in a second action for injuries arising out of the same underlying transaction. The Court found that the questionable tactics of plaintiff's counsel in litigating against Volkswagen in the second action while deliberately concealing the existence of that action from the defendants in the first action amounted to inexcusable conduct and called for application of the entire controversy doctrine. *Id.* at 343, 476 A.2d at 253.

In 1984, the New Jersey Supreme Court authorized Rule 4:5–1 as a means of foreclosing the very type of trial tactics seen in *Crispin.* Rule 4:5–1 requires that upon filing their initial pleadings, the parties to a litigation must individually certify to the court that no related action is pending. In addition, the Rule mandates that each Rule 4:5–1 certification shall include the names of any non-parties who should be joined as parties in the action. The purpose of this rule was to provide notice of the action to transactionally related nonparties, thus affording them an opportunity to intervene or otherwise guard their interests. Sylvia B. Pressler, *Current N.J. Court Rules* 4:5–1 cmt. 3 (2005).

Against the backdrop of *Crispin* and Rule 4:5–1, the New Jersey Supreme Court, in 1989, decided *Cogdell v. Hosp. Ctr. at Orange,* 116 N.J. 7, 560 A.2d 1169 (1989). The plaintiff in that case brought successive suits for birth defects that her daughter sustained as a result of alleged medical malpractice committed during delivery. In the first action Plaintiff sued the emergency room obstetrician and pediatrician, whereas in the second action Plaintiff sued the hospital and various members of its staff. In a decision marking a departure from the traditional rule that the entire controversy doctrine did not require party joinder, the New Jersey Supreme Court explicitly held that the entire controversy doctrine encompassed the mandatory joinder of parties, thereby barring plaintiff's second action against the hospital. In the years following the *Cogdell* decision, New Jersey courts applied the entire controversy doctrine to encompass claims against non-parties, occasionally with surprising results. *See Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 N.J. 280, 662 A.2d 509 (1995) (applying entire controversy doctrine to bar a legal malpractice action because plaintiff had failed to assert malpractice claims in the underlying action), *abrogated by Olds v. Donnelly,* 150 N.J. 424, 696 A.2d 633 (1997).

Facing mounting criticism for the untenable outcomes often generated in post-*Cogdell* decisions, the New Jersey Supreme Court in 1998 authorized the elimi-

nation of mandatory party joinder under the entire controversy doctrine. *See K–Land Corp. No. 28 v. Landis Sewerage Auth.*, 173 N.J. 59, 69–70, 800 A.2d 861, 867 (2002). Rule 4:5–1(b) was simultaneously amended to require disclosure of the names of non-parties who should be joined in the action under Rule 4:28 or Rule 4:29–1(b). The amended Rule 4:5–1 permits a court to impose sanctions on a party failing in its disclosure obligations under the Rule, "including dismissal of a successive action against a party whose existence was not disclosed," but states that such dismissal shall be awarded only where "failure of compliance was inexcusable and the right of the undisclosed party to defend the successive action has been substantially prejudiced by not having been identified in the prior action." R. 4:5–1(b)(2).

■ Accordingly, this Court recognizes that New Jersey's entire controversy doctrine, as it presently exists, is an equitable claim-joinder requirement that no longer mandates the joinder of parties. *K–Land*, 173 N.J. at 70, 800 A.2d at 868. The newly-diminished scope of the doctrine is compatible with Rule 4:30A, which provides that *"[n]on-joinder of claims* required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine." R. 4:30A (emphasis added). Mandatory party joinder now exists only "in special situations involving both inexcusable conduct . . . and substantial prejudice to the non-party resulting from omission from the first suit." *Hobart Bros. Co. v. Nat'l Union Fire Ins. Co.*, 354 N.J.Super. 229, 242, 806 A.2d 810, 817 (App.Div.2002) (quoting Sylvia B. Pressler, *Current N.J. Court Rules* 4:30A cmt. 1 (2002)). Thus, the question before this Court is whether CPA's failure to join MetLife as a defen-

dant in the State Court Action amounted to inexcusable conduct that caused Met-Life substantial prejudice.

The concepts of inexcusable conduct and substantial prejudice are interrelated such that the existence of substantial prejudice will often serve to render the underlying conduct inexcusable. *See id.* at 244, 806 A.2d at 819. Substantial prejudice, as contemplated by Rule 4:5–1(b)(2), means that a person not joined in an earlier action will be seriously harmed in his or her ability to maintain an adequate defense in a subsequent action. *Mitchell v. Charles P. Procini, D.D.S., P.A.*, 331 N.J.Super. 445, 454, 752 A.2d 349, 354 (App.Div.2000). Such harm might come about through "loss of witnesses, loss of evidence, fading memories, and the like," although "delay alone does not serve to create substantial prejudice." *Id.* Rather, delay generally results in substantial prejudice only when coupled with unavailability of information caused by that delay. Accordingly, "a party's access to relevant information is largely dispositive of the substantial prejudice issue." *Id.* (internal quotation marks omitted).

■ The leading New Jersey case addressing the concepts of inexcusable conduct and substantial prejudice is *Hobart Brothers*, in which the Appellate Division set forth a list of nonexclusive factors to be considered in determining whether to apply the entire controversy doctrine in the context of party joinder. These factors, modified as appropriate to fit the facts of the instant case, include the following: (1) whether the person not joined in an earlier action is precluded from seeking recovery in a subsequent action; (2) whether a person so precluded can nevertheless be alternatively compensated; (3) whether the failure to join or identify (in a 4:5–1 certification) a person was part of a strategy to thwart the assertion of a valid claim; (4) whether the failure to join or

identify a person was unreasonable under the circumstances; (5) whether a person not joined in an action should be charged with constructive knowledge of that action; (6) the extent to which judicial resources were employed in the earlier litigation; and (7) whether a person not joined in an earlier action might be unfairly hampered in their ability to mount a defense, e.g., due to loss of evidence, the running of an applicable period of limitations, or other prejudice. *See Hobart Bros.*, 354 N.J.Super. at 243, 806 A.2d at 818–19. As the *Hobart Brothers* court noted, none of these factors is dispositive, but together they suggest a result which must be weighed against a standard of fairness to the parties and the system of judicial administration. *See Oliver v. Ambrose*, 152 N.J. 383, 395, 705 A.2d 742, 748 (1998) (referring to judicial fairness as the "polestar" of the application of the entire controversy doctrine). In all instances, the party seeking application of the entire controversy doctrine bears the burden of demonstrating inexcusable conduct and substantial prejudice in view of the *Hobart Brothers* factors. *Hobart Bros.*, 354 N.J.Super. at 242, 806 A.2d at 817–18.

■ The Court finds that MetLife has failed to carry its burden of demonstrating that CPA has engaged in inexcusable conduct. As noted earlier, *Crispin* provides one example of inexcusable conduct. *Mitchell v. Charles P. Procini, D.D.S., P.A.*, 315 N.J.Super. 557, 565, 719 A.2d 201, 205 (App.Div.1998). Nothing of that nature has occurred in the instant litigation. MetLife hangs its argument on the fact that CPA, in the State Court Action, "was repeatedly given the opportunity to fully litigate all of its related claims," but failed to join MetLife as a defendant. (MetLife's Mem. in Supp. of Mot. for Summ. J. at 19.) This is not inexcusable conduct. There is no indication that

CPA's failure to join MetLife in the State Court Action reflected a *strategy* of piecemeal litigation. *Cf. Mitchell*, 315 N.J.Super. at 563, 719 A.2d at 204 (quoting excerpts from trial court's hearing on motion to dismiss in which trial judge applied entire controversy doctrine upon finding a purposeful and deliberate strategy to pursue piecemeal litigation). Instead, the facts of this case counsel in favor of this Court finding that there was no inexcusable conduct.

The Court accepts as true the certification of Ann Perkins, a Recovery Manager for Atlantic. Ms. Perkins asserts that Atlantic became involved in this litigation on or about May 14, 2003, the date on which it became subrogated to the rights of CPA. The very next day, counsel for Atlantic successfully sought severance of the conversion claim from the other claims in the State Court Action, and the trial court dismissed the conversion claim without prejudice. Atlantic then initiated the instant suit on behalf of its insured in July 2003. Far from reflecting a strategy of piecemeal litigation, these facts illustrate a course of diligent conduct on the part of Atlantic's counsel in light of Atlantic's subrogation to CPA's rights. MetLife fails to recognize that the prosecution of the conversion claim changed in May 2003, when Atlantic's counsel assumed responsibility for litigating that claim from CPA's personal counsel. Atlantic concedes that it "disagrees with CPA's counsel's evaluation of Metlife's potential liability in connection with the stock conversion claim presented." (CPA's Mem. of Law in Opp. to MetLife's Mot. for Summ. J. at 6.) Nevertheless, Atlantic urges that "counsel's prior failure to appreciate Metlife's relevance to this claim can not now be legitimately characterized or portrayed as a trial strategy." (*Id.*) This Court agrees.

The Court further finds that MetLife has failed adequately to demonstrate that it will suffer substantial prejudice from its non-joinder in the State Court Action. MetLife's argument hinges on its assertion that "CPA's intentional conduct was designed to allow CPA to argue diametrically opposed positions against different parties." (MetLife's Mem. of Law in Supp. of Mot. for Summ. J. at 32.) In addition, MetLife points to the added expense it will likely incur as a result of CPA's alleged piecemeal litigation. Neither of these arguments is availing. MetLife has not sufficiently demonstrated that its inability to participate in CPA's prior action against Mellon will substantially prejudice its ability to defend itself in the instant action. No loss of evidence has occurred, and no applicable periods of limitations have run. Nor does the Court find that the increased costs of litigation that MetLife complains of are sufficient grounds for a finding of substantial prejudice, particularly where MetLife incurred no expenses in the State Court Action. *Cf. In re Brown*, 159 B.R. 710, 717 (Bkrtcy.D.N.J.1993) (finding that increased litigation costs do not create undue prejudice so as to warrant denial of motion for leave to amend complaint).

Somewhat more troubling is MetLife's inability to defend itself by arguing that the blame lies with Mellon. In the State Court Action, to which MetLife was not a party, the court considered whether the checks issued to Mazzie required two endorsements or whether they were made payable in the alternative. The state court found that they only required one endorsement and thus dismissed the claim against Mellon. As the court observed, the consequence of this finding is to expose MetLife to potential liability for having improperly made the checks payable in the alternative. This does not mean, however, that MetLife is now foreclosed from arguing that it properly issued the checks to Maz-

zie. It only means that MetLife is precluded from diverting blame to Mellon. While this may impose some constraints on MetLife's litigation strategy, such constraints do not rise to the level of "substantial prejudice," particularly when the issue before this Court is whether MetLife, not Mellon, engaged in wrongdoing. Thus, the Court finds that MetLife is not deprived of the ability to maintain an adequate defense; it is free to argue that it followed proper procedures in issuing the checks.

Turning to the *Hobart* factors, the Court notes that the first two factors, concerning whether MetLife can recover in the instant action, are inapplicable. Concerning the third factor, the Court reiterates its finding that there is no evidence of a deliberate strategy on the part of CPA to pursue piecemeal litigation. It is a closer question whether CPA's failure to join or identify MetLife in the State Court Action was unreasonable under the circumstances; at the very least, it reflected questionable foresight on counsel's part. As to whether MetLife should be charged with constructive knowledge of the State Court Action, there is no basis in the record for the Court to so find. The Court does find, however, that judicial resources were extensively employed in the State Court Action, the trial court having decided numerous claims on the merits, including CPA's claim against Mellon. Finally, as already noted, the Court finds that MetLife's non-joinder in the State Court Action will not cause it unfair prejudice in the instant suit.

Application of the *Hobart* factors suggests a somewhat ambiguous outcome, but as *Hobart* instructed, judicial fairness is the true measure of a court's inquiry. Bearing this in mind, the Court is left with the firm impression that dismissing CPA's complaint would be judicial without being judicious. As noted earlier, the entire con-

troversy doctrine sounds in equity. Met-Life argues that its non-joinder in the State Court Action means that it is now unfairly deprived of an opportunity to litigate against Mellon. It stands to reason, however, that were this Court to dismiss CPA's complaint against MetLife, Atlantic, as subrogee to CPA, would suffer a far more terminal fate. In the pursuit of equity, this Court subscribes to the aphorism that every party deserves its day in court.

Finally, the Court takes note of Met-Life's correct observation that Atlantic, as subrogee to CPA, stands in CPA's shoes and is subject to any defenses to which CPA would be subject. For the reasons already set forth, however, the Court finds that MetLife's failure to demonstrate inexcusable conduct and substantial prejudice applies as well to CPA as it does to Atlantic. Nothing in MetLife's moving papers has convinced this Court that CPA or Atlantic pursued a deliberate strategy of piecemeal litigation. Nor has MetLife suffered substantial prejudice. The touchstone of fairness militates in favor of allowing this case to proceed.

## III. Conclusion

For the foregoing reasons, it is hereby ORDERED on this 9th day December 2004, that MetLife's motion for summary judgment to dismiss CPA's complaint is DENIED.