39 A.3d 937 (2012)
425 N.J. Super. 94
ALPHA BEAUTY DISTRIBUTORS, INC., Plaintiff-Appellant,
v.
WINN-DIXIE STORES, INC., Fruth Pharmacy, Inc., Primary One, LLC, JPM LLC, and URM Stores, Inc., Defendants, and
C & S Wholesale Grocers, Inc., and United Natural Foods, Inc., Defendants-Respondents.
Docket No. A-3111-10T2
Superior Court of New Jersey, Appellate Division.
Submitted March 13, 2012.
Decided April 3, 2012.
*938 McCusker, Anselmi, Rosen & Carvelli, attorneys for appellant (Paul F. Carvelli and Kathleen A. Hirce, Florham Park, on the brief).
Drinker Biddle & Reath, attorneys for respondent C & S Wholesale Grocers, Inc. (Frank F. Velocci and Marita S. Erbeck, Florham Park, on the brief).
Brenner & Levine, attorneys for respondent United Natural Foods, Inc., join in *939 the brief of respondent C & S Wholesalers, Inc.
Before Judges FISHER, BAXTER and MAVEN.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we consider whether the trial judge properly dismissed this action because plaintiff Alpha Beauty Distributors, Inc. did not include the claims asserted in this action or join the defendants here in a pending federal action. We conclude that the trial judge did not equitably apply the entire controversy doctrine. The core of the federal action was Alpha shareholder Bebert Azran's claim that the two other shareholders, Noel and Reid Kleinman, breached the fiduciary duties they owed to Azran and Alpha, while the object of the suit at hand was to collect customer debts that the Kleinmans may have unduly or inappropriately reduced or compromised. We, thus, reverse the order under review.

I
The inapplicability of the entire controversy doctrine is demonstrated by reference to the procedural histories of the federal action and this action and the nature of the claims asserted in both. In dismissing this suit against defendants C & S Wholesale Grocers, Inc., and United Natural Foods, Inc., the trial judge did not conduct an evidentiary hearing to ascertain the facts deemed relevant to the disposition, but instead relied upon what was revealed by the pleadings in the federal suit and this suit. Accordingly, we examine the record in the light most favorable to Alpha. See NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 365, 901 A.2d 871 (2006) (holding that, on a motion to dismiss, the opponent is entitled to "a generous and hospitable approach," an assumption of the truth of its allegations, and the benefit of all reasonable inferences).
Alpha was formed by the Kleinmans. Azran made several loans to the Kleinmans to help establish Alpha, in return for which he became the owner of eight percent of Alpha's outstanding shares. According to Azran, he lent additional funds to Alpha and as a consequence, in September 2008, the Kleinmans "agreed to convey to Azran the majority of their ownership interests in Alpha ... such that Azran assumed ownership" of eighty percent of Alpha's outstanding shares.
Azran formally terminated the Kleinmans' employment relationships with Alpha on November 6, 2008. That same day, Azran commenced a civil action on behalf of Alpha and himself against the Kleinmans in the United States District Court for the District of New Jersey. Azran alleged he had "only very recently learned the extent to which [the] Kleinman[s] ... engaged in a blatant and systematic pattern of fraudulent conduct concerning Alpha in rampant violation of their fiduciary duties." Azran and Alpha sought "to recover damages from [the Kleinmans] to satisfy the debts and obligations they incurred on Alpha's behalf during the period when they controlled its business and operations, from January to September 2008, by which time they had abandoned all responsibility for Alphabut only after stripping Alpha of its assets, destroying its business relationships and implicating substantial guarantees of Alpha's debts made by Azran as a result of their unlawful conduct." In describing this parade of wrongdoings, Azran asserted that his "review of Alpha's purchase and sales records. . . showed that many of Alpha's customers and vendors had requested [and] were permitted to assert certain credits and *940 chargebacks against purchases from Alpha that reduced the amount of money owed to Alpha for the inventory purchases they made." In this regard, Alpha mentioned a few customers by name but did not refer to C & S or United. In fact, Azran and Alpha alleged they had "yet to unravel the provenance and legitimacy of numerous other credits or chargebacks that [the Kleinmans] agreed to on Alpha's behalf."
A final pretrial order was entered in the federal shareholder suit on May 24, 2010. The detailed pretrial order reveals that the suit involved only Azran's multi-faceted claim that the Kleinmans had damaged Azran and Alpha through a course of self-dealing and conversion of corporate assets. The pretrial order did not encompass any claims that Alpha may have possessed against any customers or other entities that may have received goods or funds and paid less than the proper amount as a result of the Kleinmans' alleged violation of their fiduciary duties.
A month after entry of the federal final pretrial order, Alpha commenced this action against C & S and United, among others, alleging, in essence, unpaid book accounts. As for C & S, Alpha alleged that between approximately March and June 2008, C & S purchased $157,712.82 worth of goods for which it paid only $65,754.08. Alpha's complaint recognized that C & S had asserted certain "credits, chargebacks and deductions" and that, between October 2009 and February 2010, Alpha had attempted "to reconcile its accounts with C & S," which included a request for information from C & S. According to the complaint, "C & S thereafter requested an opportunity to review its records and justify its having taken credits, chargebacks and deductions in excess of the amount due Alpha," but C & S had not responded by the time Alpha filed its complaint. The complaint makes similar allegations against United; Alpha claimed that United was indebted to it in the amount of $7,137.15, and recounted similar attempts made between October 2009 and February 2010 to ascertain United's entitlement to credits, chargebacks and deductions in excess of the amount Alpha believed to be owed.
Alpha did not refer to the federal action in its Rule 4:5-1(b)(2) certification. In October 2010, approximately one month after C & S and United filed their answers to the complaint, and having learned of the federal suit, United moved for leave to amend its answer to include an entire-controversy defense; C & S and United also sought dismissal of the complaint on that ground. After summarizing the parties' arguments and after referring to parts of the considerable body of case law that has developed regarding the entire controversy doctrine, the trial judge drew the following conclusions from the pleadings:
It was inexcusable for [Alpha] to fail to disclose the existence of the federal court action which had been pending for two years. The failure to comply with [Rule] 4:5-1(b)(2) was addressed at oral argument at which time counsel for [Alpha] acknowledged it as a purposeful omission by saying that she determined that the cases were so different that it did not bear mentioning. The rule requires disclosure of other actions regarding the same "matter in controversy." Clearly, the allegations and remedies sought in the federal court action arise from the same set of transactions. The same chargebacks and credits form the basis for both cases. The failure to disclose the existence of the federal court action resulted in substantial prejudice to [defendants] inasmuch as the Kleinmans are identified as the wrongdoers who had *941 full authority to act on behalf of Alpha []. This contention alone would have serious impact on the defense posture of [defendants] to the allegations that they took improper credits or chargebacks. Moreover, the federal case seeks monetary damages from the [Kleinmans] for the same transactions (albeit many other[s] as well) as involve the movants. The potential for a double recovery is real and likely since the federal court matter is much further along and about to go to trial. The intention of and the policy considerations underlying the [e]ntire [c]ontroversy [d]octrine warrant dismissal of the [c]omplaint.
An order of dismissal of the claims against C & S and United was entered on November 17, 2010. The claims against Winn-Dixie Stores, Inc. had been previously dismissed for lack of personal jurisdiction; Alpha and Fruth Pharmacy, Inc. had previously reached a settlement. On January 14, 2011, the claims against the remaining defendants were dismissed for lack of prosecution.
Meanwhile, on February 8, 2011, the federal district judge entered summary judgment in favor of Azran and Alpha and against the Kleinmans in the amount of $1,366,358.30.
Alpha then filed this timely appeal, which seeks review of the order that dismissed its action against C & S and United.

II
We discern from the trial judge's written decision two separate components to the dismissal of Alpha's claims against C & S and United. The first stemmed from what the judge perceived to be a violation of Rule 4:5-1(b)(2), and the second ground was the judge's belief that the entire controversy doctrine obligated Alpha to assert its claims against C & S and United in the federal action. Although the judge's decision conflated the two concepts, we view them separately.

A
The judge's invocation of Rule 4:5-1(b)(2) and the sanctions available for its breach were simply inapplicable here. The Rule itself, as relevant here, obligates a party in its first pleadingand further imposes a continuing obligationto advise the court of other related matters or potentially necessary parties. Specifically, the Rule requires that a pleader give notice "as to whether the matter in controversy is the subject of any other action pending in any court or of a pending arbitration proceeding, or whether any other action or arbitration proceeding is contemplated; and, if so, ... the identi[t]y [of] such actions and all parties thereto." The Rule also requires that the pleader "disclose... the names of any non-party who should be joined ... or who is subject to joinder ... because of potential liability to any party on the basis of the same transactional facts." Sanctions for a violation are described in the Rule. Ibid.
Momentarily putting aside whether Alpha actually violated the Rule by failing to mention the pending federal action, we initially turn to its language to determine whether dismissal was an appropriate sanction in these circumstances for the alleged violation. The Rule's only authorization for a dismissal relates to the preclusion "of a successive action" that is appropriate only if "the failure of compliance was inexcusable and the right of the undisclosed party to defend the successive action has been substantially prejudiced by not having been identified in the prior action." R. 4:5-1(b)(2).
*942 The action the trial judge dismissed here was not "a successive action." By "successive action," the Rule clearly meant to encompass only actions following the suit in which the Rule 4:5-1(b)(2) violation occurred. The most obvious example of this would be an action where A sues B for personal injury damages, and then, later, after A v. B is concluded, A brings a claim against C for having caused the same injuries. A v. C would be a "successive action" within the intendment of the Rule and, in certain circumstances, the Rule authorizes dismissal of the successive suit against C. See, e.g., Mitchell v. Procini, 331 N.J.Super. 445, 453-54, 752 A.2d 349 (App.Div.2000). The Rule, however, does not expressly authorize dismissal of a suit because of a pleader's failure to identify a pending action, such as the federal action here.
Moreover, even if we were to assume Alpha violated the Rule, we would conclude that the leap to dismissal rather than some lesser sanction was inappropriate. Our Court Rules, from their inception, have been understood as "a means to the end of obtaining just and expeditious determinations between the parties on the ultimate merits." Ragusa v. Lau, 119 N.J. 276, 284, 575 A.2d 8 (1990) (quoting Tumarkin v. Friedman, 17 N.J.Super. 20, 27, 85 A.2d 304 (App.Div.1951), certif. denied, 9 N.J. 287, 88 A.2d 39 (1952)); see also Ponden v. Ponden, 374 N.J.Super. 1, 9-10, 863 A.2d 366 (App.Div.2004), certif. denied, 183 N.J. 212, 871 A.2d 90 (2005); Tucci v. Tropicana Casino and Resort, Inc., 364 N.J.Super. 48, 53, 834 A.2d 448 (App.Div. 2003). As a result, the Supreme Court has recognized a "strong preference for adjudication on the merits rather than final disposition for procedural reasons." Galik v. Clara Maass Med. Ctr., 167 N.J. 341, 356, 771 A.2d 1141 (2001) (quoting Mayfield v. Cmty. Med. Assocs., P.A., 335 N.J.Super. 198, 207, 762 A.2d 237 (App.Div.2000)). Indeed, the propriety of the ultimate sanction of dismissal for a violation is, as the Rule makes perfectly clear, dependent upon whether "the undisclosed party ... has been substantially prejudiced" by the lack of notice. R. 4:5-1(b)(2) (emphasis added). Because C & S and United do not qualify as "undisclosed parties"their identity was disclosed in the complaint to which the certification was appendeddismissal was unauthorized in this instance.
We also conclude, for the sake of completeness, that even if we were to find that Alpha violated the Rule by failing to mention the pending federal action, no lesser sanction would be appropriate here. C & S and United have not demonstrated they suffered any prejudice by the lack of notice. The impact of the lack of notice in Alpha's Rule 4:5-1(b)(2) certification was of very brief duration; C & S and United soon learned of the federal action and quickly moved for relief.[1] At best, United could have argued that the cost of moving for an amendment of their answers, to include the entire controversy doctrine defense, was caused by Alpha's alleged violation. Indeed, such a discretionary sanction would be appropriate if the Rule were, in fact, violated. Ibid. (authorizing "the imposition on the non-complying party of litigation expenses that could have been avoided by compliance with this rule"). But the brief delay in learning of the federal action caused no appreciable injury here. United was essentially in no different position when it moved to amend its answer than it was in the short, intervening *943 time-span following Alpha's failure to mention the federal action in its Rule 4:5-1(b)(2) certification. As United and C & S moved for dismissal at that same time, the additional expense incurred by United in also seeking leave to amend its answer was negligible.
For these reasons, even if there were a violation of Rule 4:5-1(b)(2) due to Alpha's failure to mention the federal action, that violation did not warrant dismissal of the complaint or, for that matter, any other sanction. We also conclude, for the reasons that follow, that the Rule did not require identification of the federal action because of the slim nexus between that action and the claims asserted here against C & S and United.

B
Finding no basis for dismissal based on Rule 4:5-1(b)(2), we turn to whether the entire controversy doctrine was breached and required dismissal.
We, first, conclude that the claims asserted in this action did not lie at the core of the federal action. Second, regardless of whether there was a sufficient link between the two suits to warrant inclusion of the claims asserted here in the federal action, the entire controversy doctrine is an equitable device and its application is dependent upon notions of fairness. Here, the judge did not consider the doctrine's equitable underpinnings, which, if weighed, would have militated against dismissal.

(1)
The entire controversy doctrine compels at times, and encourages at others, the joinder of related claims so as "to eliminate delay, prevent harassment of a party and unnecessary clogging of the judicial system, avoid wasting the time and effort of the parties, and promote fundamental fairness." Cogdell v. Hospital Center at Orange, 116 N.J. 7, 15, 560 A.2d 1169 (1989) (quoting Barres v. Holt, Rinehart and Winston, Inc., 74 N.J. 461, 465, 378 A.2d 1148 (1977) (Schreiber, J., dissenting)). In light of these considerations, the doctrine imposes on a litigant the duty to present "all aspects of a controversy in one legal proceeding." The Malaker Corp. Stockholders Protective Comm. V. First Jersey Nat'l Bank, 163 N.J.Super. 463, 496, 395 A.2d 222 (App.Div.1978), certif. denied, 79 N.J. 488, 401 A.2d 243 (1979). In determining what constitutes a single controversy, courts "look at the core set of facts that provides the link between distinct claims against the same or different parties." Hobart Bros. Co. v. Nat'l Union Fire Ins. Co., 354 N.J.Super. 229, 244, 806 A.2d 810 (App.Div.2002).
The lack of relationship or commonality between the federal suit and the suit at hand is similar to that found in the successive actions considered in Joel v. Morrocco, 147 N.J. 546, 688 A.2d 1036 (1997). There, an action in lieu of prerogative writs led to a settlement, which required the partnership developing a condominium project to pay periodic sums to a neighboring property owner. Id. at 551, 688 A.2d. 1036. In supplementary proceedings, the neighbor's successor learned the identity of the partnership's members and filed suit against the individual partners because, as had been determined in Seventy-Three Land, Inc. v. Maxlar Partners, 270 N.J.Super. 332, 637 A.2d 202 (App.Div.1994), a judgment against a partnership alone, in an amount in excess of the partnership's assets, would not reach its individual partners. Joel, supra, 147 N.J. at 552-53, 688 A.2d 1036. The Joel Court concluded that the second suit against the individual partners was not barred by the failure to include them in the first suit not only because of fundamental fairness, to which we will shortly turn, but also because *944 what was viewed as the first suitthe controversy concerning the condominium projectwas not a suit by a creditor of the partnership; accordingly, the Court found there was no "commonality of facts undergird[ing] each set of claims." Id. at 553, 688 A.2d 1036 (quoting DiTrolio v. Antiles, 142 N.J. 253, 258, 662 A.2d 494 (1995)). See also Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381, 114 S.Ct. 1673, 1677, 128 L.Ed.2d 391, 397-98 (1994) (finding a breach of contract claim and a suit based on the alleged breach of the agreement that settled the breach of contract suit to be separate and distinct).
To be sure, there are facts common to both the federal action and the claims asserted by Alpha here, but these actions are not part of the same core controversy. In the federal action, Azran sought to demonstrate that the Kleinmans violated fiduciary duties owed to Alpha and him, as a fellow shareholder, for a host of reasons, including the rendering of improper discounts or credits to customers.[2] The claims for collection on the accounts of C & S and United in this suit may have been part of the anticipated ripples caused by the Kleinmans' alleged misconduct, but the claims did not lie at the heart of the federal controversy.
We, thus, reject the contention that the entire controversy doctrine required the inclusion in the federal action of the tangentially-related claims asserted against C & S and United in this action.

(2)
Even if it could be said that the two suits had a closer relationship than we attribute, the trial judge's decision to dismiss this action failed to account for the doctrine's equitable underpinnings. Joel, supra, 147 N.J. at 555, 688 A.2d 1036; Hobart Bros., supra, 354 N.J.Super. at 241, 806 A.2d 810. As our Supreme Court has recognized, the entire controversy doctrine rests on the "`twin pillars' [of] fairness to the parties and fairness to the system of judicial administration." Joel, supra, 147 N.J. at 555, 688 A.2d 1036 (quoting Prevratil v. Mohr, 145 N.J. 180, 197, 678 A.2d 243 (1996)). Because not every successive suit imperils those concerns, and some only in varying degrees, it has been recognized that "preclusion is a remedy of last resort." Vision Mortg. Corp. v. Chiapperini, Inc., 156 N.J. 580, 584, 722 A.2d 527 (1999) (quoting Olds v. Donnelly, 150 N.J. 424, 446-47, 696 A.2d 633 (1997)).
In considering the impact on these "twin pillars" here, we find that the continuation of this suit would be neither unfair to C & S and United nor prejudicial to the efficient administration of justice. Indeed, had C & S and United been joined to the federal action, they might have been prejudiced by being required to appear for proceedings of no particular interest to them. The major theme of the federal action was the contention that the Kleinmans had violated the fiduciary duties they owed to Alpha and their fellow shareholder by engaging in a host of conduct detrimental to the well-being and future existence of Alpha. Among those many alleged defalcations were Azran's claims that improper credits were given to customers; although not mentioned in the federal complaint, C & S and United were two such customers. Certainly, C & S and United had an indirect interest in the federal actionan outcome in the Kleinmans' favor would likely have dampened Alpha's likelihood of a recovery against C & S and United. But C & S and United would otherwise likely *945 have had little or no interest in actually participating in the federal litigation and the many other disputes involving the relationship between and among Alpha's shareholders. It would, thus, be neither unfair nor prejudicial to C & S and United to permit this action to continue to a disposition on its merits because it was neither unfair nor unreasonable for Alpha and Azran to have left them out of the federal litigation.
The trial judge was also required to consider whether it would be fair to Alpha to dismiss the action. That determination required consideration of whether Alpha "had a fair and reasonable opportunity" to assert the claim in the federal action but chose not to do so. DiTrolio, supra, 142 N.J. at 273, 662 A.2d 494. The record, viewed in the light most favorable to Alpha, see NCP Litig. Trust, supra, 187 N.J. at 365, 901 A.2d 871, reveals that the circumstances preceding the federal complaintand the potential for continuing damage and the implication for personal guarantees provided by Azran[3]rightfully counseled in favor of the quick commencement of suit by Azran and Alpha against the Kleinmans. Azran had obtained a majority interest in Alpha only a short time before commencement of the federal suit and, indeed, did not formally terminate the Kleinmans as employees until the day the federal suit was filed. In moving at such a rapid pace, Alpha and Azran alleged, as we have already noted, that the investigation into the Kleinmans' conduct had a long way to go. And the mention in the federal complaint of alleged improper credits to two customers, Winn-Dixie and Fruth, but not others, such as C & S and United, further suggested that Alpha and Azran did not yet have sufficient facts to prosecute claims against C & S and United. As the opponent of a motion to dismiss, Alpha was entitled to have the trial judge assume that Alpha was in no position to assert a claim against C & S and United at the time the federal complaint was filed.
The record also required the trial judge's assumption that Alpha's readiness to proceed against C & S and United did not improve until the time it actually filed the complaint here. As the complaint here alleged, Alpha had engaged in communications with both C & S and United between October 2009 and February 2010 in an attempt to reconcile their accounts. Alpha also alleged that C & S and United both sought additional time to review their own records to determine the bases for the credits, chargebacks and deductions they had asserted. Rather than precipitously assert claims against these and other customers, Alpha's new management investigated and engaged in discussions with its customers before commencing this action. The proper application of the standard applicable to motions to dismiss required that the trial judge assume that Alpha did not have "a fair and reasonable opportunity" to include C & S and United as defendants in the federal action either when it originally filed the complaint or at any point prior to the entry of the final pretrial order, which signaled the termination of *946 any further opportunity to amend the federal pleadings.
Lastly, in considering the impact on the efficient administration of justice by permitting this suit to proceed, the chief question, as described by Justice O'Hern for the Joel Court, is whether the trial court here would have had "to rerun a course previously run." Joel, supra, 147 N.J. at 553, 688 A.2d 1036. As it turns out, on February 8, 2011, Azran and Alpha obtained summary judgment against the Kleinmans for $1,366,358.30. To prevent a double-recovery that might result from this satellite action brought by Alpha against its customers, the federal district judge ordered:
to the extent that [p]laintiffs recover from any customers any monies due and owing for product sold and delivered by Alpha Beauty Distributors, Inc., then [the Kleinmans] shall be entitled to an OFFSET against the amount of the Judgment entered herein against them in the amount equal to fifty percent (50%) of the NET PROCEEDS....
This language demonstrates that rather than find anything untoward in the pendency of a second suit against Alpha's customers in another jurisdiction, the federal district judge simply addressed ramifications of Alpha's potential recovery in our courts. Moreover, this disposition of the claims against the Kleinmans eliminated the possibility that evidence adduced during a federal court trial, which had been rendered unnecessary by the entry of summary judgment, would be replayed in a trial here of Alpha's claims against C & S and United.
We are mindful that the summary judgment entered in federal court occurred a few months after the trial judge here dismissed Alpha's complaint. Through the hindsight provided by the federal summary judgment, we know that the two cases could have co-existed without generating a dismissal of this case. We are not suggesting that the trial judge should be held to a standard of clairvoyance.
That the federal action was surely to terminate before much had occurred in the case at hand was obvious. Before the complaint here was filed, a final pretrial order had been entered in the federal action. That event signaled the end of discovery and a preclusion of the parties' ability to join additional parties, leaving only the disposition of the case on its merits by motion or trial. The trial judge here recognized this when she noted in her written decision that "the federal court matter is much further along and about to go to trial."[4] Considering that the federal action was nearing its end when the suit at hand had just begun, there was much to commend a delay in the disposition of the motion to dismiss pending the termination of the federal action.
In short, the trial judge was not relegated to merely granting or denying the motion to dismiss; she should have also considered whether it was more propitious to simply postpone decision pending further developments in federal court. Had the judge taken that step, it would have become apparentafter summary judgment was entered in federal court a few months laterthat dismissal out of a concern for a double recovery or duplication of effort was not appropriate.

III
For these reasons, we conclude that Alpha did not violate Rule 4:5-1(b)(2) by *947 failing to mention the pending federal action and that the entire controversy doctrine did not warrant dismissal of this action.
Reversed.
NOTES
[1] United filed its answer on September 13, 2010, and C & S filed its answer on September 20, 2010. United moved to amend its answer to include a defense based on the entire controversy doctrine, and for dismissal on that ground, on October 22, 2010. C & S notified the trial court on November 4, 2010, of its joinder in United's motion to dismiss.
[2] Although the federal complaint discussed improper discounts or credits, only two customers were mentioned. C & S and United were not referred to in the federal complaint.
[3] Alpha and Azran alleged in their federal complaint that the Kleinmans "controlled [Alpha's] business and operations, from January to September 2008, by which time they had abandoned all responsibility for Alphabut only after stripping Alpha of its assets, destroying its business relationships and implicating substantial guarantees of Alpha's debts made by Azran as a result of their unlawful conduct." Assuming the truth of this allegationas we must on a motion to dismissit behooved Alpha and Azran to expeditiously pursue their remedies against the Kleinmans, even though they may not have then understood the full extent of the damage or the availability of relief from others, such as Alpha's customers and vendors.
[4] Any doubt about the status of the federal action could have been clarified by communications between the two courts.